**ZURICH AMERICAN INSURANCE COMPANY, Plaintiff,**

v.

**ABM INDUSTRIES, INC., Defendant.**

**No. 01 Civ. 11200(JSR).**

United States District Court,
S.D. New York.

May 29, 2003.

Stuart Cotton, Leslie A. Platt, Thomas Brunner, Mary Borja, Amy Kirtland, Philip C. Silverberg, Mound, Cotton & Wottan, New York City, for Zurich American Ins. Co.

John Ellis, Richard P. Lewis, Anderson, Kill & Olick, PC, New York City, Richard Phelps Lewis, Anderson et Ano, William G. Passannante, Anderson, Kill, Olick PC, New York City, for ABM Industries, Inc.

*MEMORANDUM ORDER*

RAKOFF, District Judge.

As of September 11, 2001, defendant ABM Industries, Inc. ("ABM") was responsible for providing janitorial and related services for most of the World Trade Center complex. Plaintiff Zurich American Insurance Company ("Zurich") was ABM's insurer. This declaratory judgment action seeks to determine the extent of Zurich's liability to ABM as the result of the World Trade Center's destruction.

Presently pending before the Court are the parties' respective motions for partial summary judgment, as well as ABM's post-discovery motion to amend its pleadings to add an additional counterclaim. For the following reasons, Zurich's motion is granted and ABM's motions are denied.

It is undisputed that at all times here relevant ABM provided janitorial, lighting, and engineering services to the public common areas of the World Trade Center, and also provided at least janitorial services to approximately ninety-seven percent of the tenants in the World Trade Center. *See* Affidavit of Mary E. Borja sworn to July 18, 2001 ("Borja Aff."), Exh. 27 (Deposition of Nikoll Vataj, June 5, 2002), at 35–36; Affidavit of Mary E. Borja sworn to July 9, 2002 ("Borja Supp. Aff."), Exh. 18 (Deposition of Fred Wolsleger, June 3, 2002) at 21, Exh. 21 (Deposition of Terry D. McNeil, May 29, 2002) at 25–26. Additionally, ABM itself occupied office and storage space in the World Trade Center, had access to the janitorial closets and sinks located on every floor of the World Trade Center, and enjoyed exclusive after-hour use of the World Trade Center's freight elevators. *See* Borja Aff.,

Ex. 15 (Email from Debra L. Butler, May 23, 2002) at ABM022692, Exh. 23 (McNeil Dep.) at 28–31, Exh. 27 (Vataj Dep.) at 57–58, 60–61.

Pursuant to insurance policy number MLP 8339383–05 (the "Policy"), purchased by ABM from Zurich at an annual premium of $224,591, Zurich agreed to insure ABM for the period from February 1, 2001 through February 1, 2002. *See* Borja Supp. Aff., Exh. 1 (the Policy). The Policy provided coverage to ABM for, *inter alia,* loss or damage to ABM"s "real and personal property," including "property owned, controlled, used, leased or intended for use" by ABM, § 7(A)(1); "loss resulting directly from the necessary interruption of [ABM's] business caused by direct physical loss or damage ... to insured property at an insured location," § 7(B)(1); "Extra Expense incurred" by ABM as a result of "loss, damage, or destruction" ... to [ABM's] real or personal property," § 7(C)(1); and losses related in various specified ways to: "off premises utility and power stations," § 7(F)(1), "properties not operated by [ABM]," § 7(F)(2), "Impounded Water," § 7(F)(3), "Leader Property," § 7(F)(4), "Interruption by Civil or Military Authority," § 7(F)(5), and "Ingress/Egress," § 7(F)(6).

Against this background, the Court hereby makes the following determinations of law:

■ *First,* ABM cannot recover under § 7(B)(1) of the Policy for any business interruption loss claimed by ABM as a result of the destruction of the World Trade Center premises it served but did not otherwise occupy (*i.e.* the tenants' premises and the public common areas), but only for business interruption loss caused by the destruction of the World Trade Center space that ABM itself occupied or caused by the destruction of

ABM's own supplies and equipment located in the World Trade Center.

In this regard, Section 7(B)(1) of the Policy provides that: .

> Subject to all other provisions of this policy, this policy insures against loss resulting directly from the necessary interruption of business caused by direct physical loss · or damage, not otherwise excluded, to insured property at an insured location.

"Insured property," in turn, is effectively defined by § 7(A)(1) of the Policy, which extends basic coverage to:

> The interest of the Insured in all real and personal property including but not limited to property owned, controlled, used, leased or intended for use by the Insured....

■ Seeking to squeeze within the limits of this definition, ABM argues that it "used" the common areas and tenanted premises of the World Trade Center to perform its operations and generate income. *See* ABM's Memorandum of Law in Support of its Motion for Partial Summary Judgment, at 21; *see also* Transcript, May 15, 2002, at 21. However, the plain meaning of "use" as employed in § 7(A)(1) is "to carry out a purpose or action by means of." *Webster's Third New International Dictionary of the English Language Unabridged* 2524 (2002). Thus, for instance, ABM could carry out its purpose of cleaning its customers' premises by means of a mop, broom, or other cleaning tool, and could carry out its purpose of generating income by means of the work it performed. ABM, however, did not accomplish any purpose "by means of" the property here in issue, *viz.,* the physical premises occupied by tenants or open to the general public. Such premises were the locations of ABM's acts, not the means through which the acts were accomplished. Furthermore, even if ABM could somehow be

said to have "used" the property in issue, it did not thereby acquire any legally cognizable "interest" in the property.

■ ABM's fallback argument that ABM somehow "controlled" such premises at the World Trade Center is even more far-fetched. To "control" is "to exercise restraining or directing influence over" or "to have power over." *Webster's Third New International Dictionary of the English Language Unabridged* at 496. While no one questions the importance of janitorial services in modern urban society, the notion that by providing such services to a building's owner or tenants the janitor thereby "controls" the building is the functional equivalent of saying that the ground crew "controls" Yankee Stadium. This umpire is not persuaded. Again, moreover, even if ABM could somehow be said to have exercised some kind of "control" over the property here in question, it was not the kind of control that would give ABM a legally cognizable "interest" in the property.

■ Finally, ABM argues that since § 7(F)(2), the Policy's business interruption provision for uninsured property, extends only to "properties not operated" by ABM, by implication the "insured property" referenced in § 7(B)(1) extends to property that is operated by ABM, regardless of whether or not it falls within the definition of § 7(A)(1), because otherwise there would, supposedly, be a gap in coverage. However, in the absence of any express language in the Policy supporting this contention, ABM's "coverage by implication" argument supplies far too weak an inference to carry the insured's burden of showing that its "claim falls within the terms and conditions" of the Policy. *Paul Revere Life Ins. Co. v. Bavaro,* 957 F.Supp. 444, 447 (S.D.N.Y.1997) *citing Preferred Accident Ins. Co. v. Grasso,* 186 F.2d 987, 990 (2d Cir.1951).

Moreover, even assuming *arguendo* that the Policy covered property "operated" by ABM, ABM no more "operated" the premises here in issue than it "owned," "controlled," "used," or "leased" such premises. Specifically, the transitive verb "to operate" has the following meanings:

> 1: to cause to occur ... 2 a: to cause to function usu. by direct personal effort ... b: to manage and put and keep in operation whether with personal effort or not ... 3: to perform surgery on ...

*Webster's Third New International Dictionary of the English Language Unabridged* at 1581. None of these meanings describes ABM's relationship with either the common areas or the tenanted premises in the World Trade Center: ABM did not cause these areas or premises to function, nor did it manage the areas or premises. ABM may have operated the supplies and equipment it used to clean the premises and to turn on and off the lights, but it in no way operated the real property itself.

■ *Second,* ABM cannot recover under § 7(C) of the Policy for extra expenses that did not result from the destruction of property owned, controlled, used, leased, or intended for use by ABM (as previously defined by the Court, *supra*). Specifically, the following "extra expense" claims by ABM are disallowed:

> (1) $12,657,287 in increased employee costs incurred pursuant to an agreement entered with Local 32B–32J of the janitors' union, which required ABM Janitorial Services to offer senior employees displaced on September 11, 2001 the jobs of junior employees working at jobs sites throughout Manhattan, Brooklyn, Queens, and Staten Island on February 4, 2002, and to hire in order of seniority any new employees from a preferential hiring list of employees who were either displaced on September 11, 2001 but not

"bumped-in" on February 4, 2002 or who were "bumped-out" on February 4, 2002, *see* Borja Supp. Aff., Exh. 13 (CAPS Report) at claim notes, p. 6;

(2) $7,687,181 in increased state unemployment obligations incurred by ABM as a result of the termination of employees caused by the events of September 11, 2001, *see* Borja Supp. Aff., Exh. 13 (CAPS Report), at claim notes, p. 9;

(3) $1,320,963 in termination costs incurred pursuant to an agreement with local union 94–94A–94B of the engineers' and carpenters' union, which required ABM Engineering Services to pay union members terminated as a result of the events of September 11, 2001 a severance package based on seniority, *see* Borja Supp. Aff., Exh. 13 (CAPS Report) at claim notes, p. 10;

(4) $493,947 in wages and expenses paid by ABM Engineering Services to former World Trade Center employees between September 11, 2001 and April 2, 2002, *see* Borja Supp. Aff., Exh. 13 (CAPS Report) at claim notes, p. 10; and

(5) $100,000 in claims preparation fees, *see* Borja Supp. Aff., Exh. 13 (CAPS Report) at schedule 1.

In this regard, § 7(C)(2) of the Policy defines "extra expense" to mean:

the excess of the total cost chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business had no loss or damage occurred.

However under § 7(C)(1) of the Policy, coverage only extends to those extra expenses:

resulting from loss, damage, or destruction covered herein during the term of this policy to real or personal property as described in Clause 7.A.

Thus, ABM's extra expense claim, like its § 7(B)(1) business interruption claim, fails to the extent the extra expenses incurred by ABM resulted from the destruction of property that was not "owned, controlled, used, leased or intended for use" by ABM, *see* § 7(A)(1).

It is undisputable that the aforementioned extra expenses claimed by ABM for increased employee costs, employee termination costs, employee wages and expenses, and increased unemployment costs resulted from the destruction of the tenanted premises and common areas ABM serviced in the World Trade Center, and the loss of business caused thereby, and not from the destruction of ABM's equipment, supplies, or office or storage space in the World Trade Center. As the Court has already determined that such premises were not owned, controlled, used, leased, or intended for use by ABM, the aforementioned extra expenses claimed by ABM are not recoverable under § 7(C).

*Third*, ABM cannot recover under § 7(F) for its claims relating to off-premises utilities,[1] impounded water,[2] leader

---

1. Section 7(F)(1) provides: "This policy is extended to cover the actual loss sustained by the Insured due to the necessary interruption of business as a direct result of direct physical loss or damage of the type insured against by this policy to off premises utility and power stations, substations, transformer or switching or pumping stations, including off-premises poles, towers, and transmission and distribution lines furnishing electricity, steam, communications, water, gas or refrigeration to the insured premises, all of the above located within one (1) statute mile of insured premises incurring the loss. This extension excludes coverage for satellite transmissions."

2. Section 7(F)(3), titled "Impounded Water," provides: "This policy also insures against loss resulting from damage to or destruction by causes of loss insured against, to dams, reservoirs, or equipment connected therewith when water, used as a raw material or used for power or for other purposes, stored be-

property,[3] interruption by civil or military authority,[4] and ingress/egress[5] because such losses did not result from the conditions identified in the applicable provisions of the Policy but from the fact that the premises of ABM's customers in the World Trade Center are no longer available to be served.

As to one of these claims—relating to so-called "leader property"—ABM has itself cross-moved for summary judgment, seeking to locate in § 7(F)(4) an alternative basis for coverage of the same business interruption claims for which it unsuccessfully seeks coverage under § 7(B), *see supra.* Specifically, ABM asserts that if the Court finds that any part of the World Trade Center is not covered "real and personal property" under § 7(A)(1) and thus not covered by § 7(B), it must be "leader property" under § 7(F)(4), *i.e.,* "properties not owned or operated by the Insured, located in the same vicinity as the Insured, which attracts business to the Insured."

■ The reason ABM seeks to shoehorn its business interruption claim within § 7(F)(4)—as opposed to within the more straightforward § 7(F)(2), relating to losses resulting from damage to "property not operated" by ABM[6] (any claims relating to which are unaffected by this Memorandum Order)—is because it is undisputed that § 7(F)(2) coverage is capped at $10 million, whereas it is disputed whether such a cap applies to § 7(F)(4). But the Court need not reach this latter issue because it is plain that neither the World Trade Center nor its constituent parts is "leader property" in the "vicinity" of ABM which "attracts business" to ABM, but rather is itself the site and source of the ABM business here at issue. This is not a case, for example, where a related business located near a ballpark might suffer a loss if the ballpark were destroyed. Here, rather, the destruction of the World Trade Center caused loss to ABM's business by destroying the tenanted premises and common areas where ABM supplied its services. Such a situation falls comfort-

---

hind such dams or reservoirs is released from storage and causes an interruption of business as a result of lack of water supply from such sources[.]"

3. Section 7(F)(4), titled "Leader Property," provides: "This policy also insures against loss resulting from damage to or destruction by causes of loss insured against, to property not owned or operated by the Insured, located in the same vicinity as the Insured, which attracts business to the Insured."

4. Section 7(F)(5), titled "Interruption by Civil or Military Authority," provides: "This policy is extended to cover the loss sustained during the period of time when access to real or personal property is impaired by order or action of civil or military authority issued in connection with or following a peril insured against. Coverage shall apply for a period of 4 weeks."

5. Section 7(F)(6), titled "Ingress/Egress," provides: "The Company will pay for the actual

Business interruption loss sustained by the Insured due to direct physical loss or damage to property of the type insured under this Policy, from an insured peril during the period of time, when as a result of such insured peril, ingress to or egress from the Insured's premises is prevented."

6. Section 7(F)(2) provides in pertinent part:

This policy is extended to cover the actual loss sustained by the Insured due to the necessary interruption of business as the result of direct physical loss or damage of the type insured against to properties not operated by the Insured which wholly or partially prevents any direct supplier of goods and/or services to the Insured from rendering their goods and/or services, or property that wholly or partially prevents any direct receiver of goods and/or services from the Insured from accepting the Insured's goods and/or services.

ably within the confines of § 7(F)(2), but not at all within the limits of § 7(F)(4).

■ Similarly, none of ABM's claimed losses was meaningfully caused by damage to off-premises utility lines, § 7(F)(1), lack of water supply, § 7(F)(3), an order or action of civil or military authority, § 7(F)(5), or property damage preventing "ingress to or egress from" ABM's own premises, § 7(F)(6), but rather resulted from the destruction of the premises that ABM serviced. Even had utility lines remained undamaged, water been readily available, no civil orders issued, and ingress and egress remained clear, ABM would still have lost its entire business in the World Trade Center as the result of the total destruction of its customers' premises.

*Fourth,* the foregoing determinations equally apply to ABM's claims relating to the losses arising from damage to premises of ABM's customers outside the World Trade Center.

■ *Fifth,* ABM's claim for consequential damages arising from Zurich's alleged breach of contract must be dismissed. In response to the prong of Zurich's motion seeking summary judgment on this claim, ABM has not alleged any breaches of contract that would support a consequential damages claim beyond Zurich's refusal to agree to the very claims that the Court has now held were rightfully rejected. Indeed, even as to these now-rejected claims, let alone any remaining claims, ABM has ut-

terly failed to specify the nature of its alleged consequential damages or adduce competent evidence showing, as required for any such claim, that the consequential damages "were foreseeable and within the contemplation of the parties at the time the contract was made," *Martin v. Metro. Prop. & Cas. Ins. Co.,* 238 A.D.2d 389, 656 N.Y.S.2d 318, 318–19 (2d Dep't 1997) (internal quotation marks omitted), *quoting Sweazey v. Merchs. Mut. Ins. Co.,* 169 A.D.2d 43, 571 N.Y.S.2d 131, 132 (3d Dep't 1991). *See also Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989).[7]

■ *Sixth,* ABM's motion to amend its counterclaim to add a claim that Zurich engaged in bad faith during the course of the litigation must be denied. The purported claim is simply a hodge podge of untimely, immaterial, and/or futile nitpicks. It asserts, for example, that Zurich has improperly asserted insurance coverage positions inconsistent with the interpretation of the Policy offered by Zurich's own witnesses, *see* ABM's Memorandum of Law in Support of its Motion to Amend its Counterclaim, at 3–4—whereas, assuming *arguendo* this were true, it would be entirely permissible, *see* F.R. Ev. 607; *see also Guadagno v. Wallack Ader Levithan Assocs.,* 950 F.Supp. 1258, 1261 (S.D.N.Y. 1997). The proposed counterclaim also alleges that Zurich improperly obtained discovery before the lawsuit commenced under the guise of seeking to adjust its

---

7. *Sabbeth Indus. Ltd. v. Pa. Lumbermens Mut. Ins. Co.,* 238 A.D.2d 767, 656 N.Y.S.2d 475, 477 (3d Dep't 1997), relied on by ABM, is not dispositive because in concluding that consequential damages for, *inter alia,* lost value to the insured's business as the result of the insurer's breach of the insurance contract were foreseeable under the policy at issue, the *Sabbeth* court considered the insurer's refusal to pay the insured any and all business interruption coverage in light of the "specific pro-

tection that [business interruption] coverage provides." *Id.* Here, however, the Court has determined that Zurich properly denied ABM's business interruption claim under § 7(B) for the destruction of ABM's customers' premises in the World Trade Center, which comprised the overwhelming majority of ABM's business interruption claim, and Zurrich has conceded liability under § 7(F)(2) for the destruction of such premises.

claim, *see* ABM's Memorandum of Law in Support of its Motion to Amend its Counterclaim at 5—whereas, assuming *arguendo* any such behavior occurred and was improper, it should properly have been addressed by ABM's bringing a motion for preclusion and sanctions at the outset of the litigation. Still further, the proposed counterclaim alleges that Zurich wrongly informed the Court that ABM, through its underwriter, had drafted § 7(B)(1) and § 7(F)(2) of the Policy even though Zurich allegedly knew that these provisions were in fact authored by Zurich's own underwriter, *see id.* at 5—whereas, even assuming *arguendo* that the error was intentional, it proved immaterial to any determination by the Court and thus would give rise, at most, to a request to the Court to impose sanctions.

Without multiplying examples further, the conclusion is obvious that defendant's belated attempt to dress up its discovery and other pre-trial disputes as a new counterclaim must fail. Moreover, even if the potpourri of allegations that ABM includes in its proposed new counterclaim had greater merit than they do, their joinder at this stage with this otherwise straightforward insurance coverage dispute could only create confusion and consequent prejudice, and thus the Court would still be obliged to deny the motion to amend. *See* Fed.R.Civ.P. 15(a); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

For the foregoing reasons, Zurich's motion for partial summary judgment is granted in its entirety, and ABM's motions for partial summary judgment and to amend its counterclaim are denied in their entirety. Counsel for the respective parties should jointly telephone the Court by no later than June 12, 2003 to schedule the prompt trial of the remaining aspects of this case.

SO ORDERED.