397 F.3d 158
 ZURICH AMERICAN INSURANCE CO., Plaintiff-Counter-Defendant-Appellee,
v.
ABM INDUSTRIES, INC., Defendant-Counterclaimant-Appellant.
Docket No. 04-0445-CV.
 United States Court of Appeals, Second Circuit.
 Argued September 24, 2004.
 Decided February 9, 2005.
 
 COPYRIGHT MATERIAL OMITTED John N. Ellison, Philadelphia, Pennsylvania (Richard P. Lewis, Anderson Kill & Olick, P.C., New York, New York, of counsel), for Defendant-Counterclaimant-Appellant ABM Industries, Inc.
 Thomas W. Brunner, Washington, D.C. (Mary E. Borja, Wiley Rein & Fielding LLP, Washington, D.C.; Stuart Cotton, Philip C. Silverberg, Mound Cotton Wollan & Greengrass, New York, New York, of counsel), for Plaintiff-Counter-Defendant-Appellee Zurich American Insurance Co.
 Before: CARDAMONE and B.D. PARKER, Circuit Judges.*
 CARDAMONE, Circuit Judge:
 
 
 1
 The terrorist attack on the World Trade Center complex in lower Manhattan on September 11, 2001 brought about a harvest of bitter distress and loss. Of the complex, one stone was not left on another, it was all thrown down, bringing about, in addition to human casualties, the loss and destruction of businesses. It is the loss of one business that is the focus of this appeal.
 
 
 2
 Appellant ABM Industries Incorporated (ABM, appellant, or insured), an engineering and janitorial service contractor, provided extensive services at the World Trade Center complex (WTC or complex). ABM was insured against business interruption by appellee Zurich American Insurance Company (Zurich, appellee, or insurer). Zurich, as plaintiff, initiated the instant litigation by bringing a declaratory judgment action in the United States District Court for the Southern District of New York (Rakoff, J.) against ABM, asking the court to determine the extent of its liability to ABM resulting from the loss of the WTC. ABM had sought from Zurich business interruption (BI) insurance coverage for its losses.
 
 
 3
 ABM appeals from an order dated May 28, 2003 and final judgment entered on January 6, 2004 in the district court, denying its motion for partial summary judgment and granting such a motion in favor of Zurich. ABM contends the district court erred when it determined that, as a matter of law, ABM was not entitled to coverage under the Business Interruption provision, the Leader Property provision, the Civil Authority provision, and the Extra Expense provision of its insurance policy with Zurich. ABM also asserts that the district court abused its discretion when it granted Zurich's motion to exclude evidence supporting a two-occurrence claim.
 
 BACKGROUND
 A. ABM Industries
 
 4
 ABM provided extensive janitorial, lighting, and engineering services at the World Trade Center. It operated the heating, ventilating, and air-conditioning (HVAC) systems for the entire WTC, essentially running the physical plant. ABM serviced the common areas of the complex pursuant to contracts with the owners Silverstein Properties and the Port Authority of New York and New Jersey.
 
 
 5
 Under these contracts ABM had office and storage space in the complex and had access to janitorial closets and slop sinks located on every floor of the WTC buildings. ABM also had effective control over the freight elevators. At the time of the attacks, it employed more than 800 people at the WTC, and its exclusive and significant presence at the complex allowed it to secure service contracts with nearly all of the WTC's tenants. ABM also had service contracts with various building owners and tenants at 34 other locations in lower Manhattan.
 
 
 6
 In order to handle these enormous responsibilities at the WTC, ABM created and manned a call center to which tenants reported problems. ABM's engineering department took complaints at the call center and dispatched its employees to remedy problems as they arose. Additionally, ABM developed complex preventative maintenance schedules through state-of-the-art software that tracked the equipment in the WTC. These procedures allowed ABM to repair equipment before it malfunctioned.
 
 B. The Insurance Policy
 
 7
 ABM procured insurance coverage from Zurich for properties serviced by ABM throughout North America under an insurance policy numbered MLP 8339383-05 (policy). The policy provides a blanket limit of $127,396,375, subject to various sublimits. Section 7.A(1) of the policy covers loss or damage to "real and personal property, including but not limited to property owned, controlled, used, leased, or intended for use by the Insured" (Insurable Interest provision). In addition to covering property damage, the policy also provides business interruption coverage under § 7.B(1) by insuring against "loss resulting directly from the necessary interruption of business caused by direct physical loss or damage, not otherwise excluded, to insured property at an insured location" (Business Interruption or BI provision). The blanket limit of $127,396,375 is the only applicable limit to the BI provision.
 
 
 8
 Relatedly, § 7.C(1) of the policy provides insurance coverage for extra expenses "incurred resulting from loss, damage, or destruction covered herein ... to real or personal property as described in [the Insurable Interest provision]" (Extra Expense provision). Section 7.C(2) defines "[e]xtra [e]xpense" as the "total cost chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business had no loss or damage occurred." This provision is subject to a $50,000,000 per-occurrence sublimit.
 
 
 9
 The policy also contains three relevant time element extensions. First, § 7.F(2) of the policy provides extended coverage to actual losses sustained
 
 
 10
 due to the necessary interruption of business as the result of direct physical loss or damage of the type insured against to properties not operated by the Insured which wholly or partially prevents any direct supplier of goods and/or services to the Insured from rendering their goods and/or services, or property that wholly or partially prevents any direct receiver of goods and/or services from the Insured from accepting the Insured's goods and/or services
 
 
 11
 (Contingent Business Interruption or CBI provision).
 
 
 12
 Second, § 7.F(4) of the policy "insures against loss resulting from damage to or destruction by causes of loss insured against, to property not owned or operated by the Insured, located in the same vicinity as the Insured, which attracts business to the Insured" (Leader Property provision). Finally, § 7.F(5) of the policy covers losses sustained "during the period of time when access to real or personal property is impaired by order or action of civil or military authority issued in connection with or following a peril insured against" (Civil Authority provision).
 
 
 13
 ABM's claims under the policy arise out of the complete destruction of the WTC by the terrorist attacks of September 11, 2001. ABM declares it has lost, as a result of these events, all income that it derived from its operations at the WTC. Specifically, it asserts that it should be compensated for its lost income resulting from the destruction of: (1) equipment it owned and used to perform its janitorial and maintenance services; (2) its offices and warehouses in which ABM operated and stored its supplies; (3) the on-site call center; (4) the freight elevators, janitorial closets and slop sinks to which it had exclusive access; (5) the common areas in the WTC; and (6) the spaces occupied by the tenants with whom ABM had contracts to provide services.
 
 
 14
 Moreover, ABM contends that the loss of the WTC resulted in a series of union negotiations and an increase in unemployment compensation claims and that it incurred additional expenses as a result. ABM also seeks coverage for losses stemming from police orders that prevented it from conducting operations at 34 locations in lower Manhattan after September 11.
 
 C. Proceedings Below
 
 15
 In its complaint Zurich requested a declaration that ABM's business interruption losses were subject to a $10 million per-occurrence limit of liability. Zurich argued that this sublimit applied because ABM's claim arose from damage and destruction of the premises of ABM's customers and hence was encompassed by the policy's Contingent Business Interruption clause — a provision triggered by damage to properties "not operated by the Insured."
 
 
 16
 ABM contested the applicability of the CBI provision and insisted instead that the relevant provision, to which no sublimit applies, is the Business Interruption provision, invoked by ABM's extensive relationship with the World Trade Center complex. ABM also claimed coverage under the Extra Expense, Leader Property, and Civil Authority provisions of the policy.
 
 
 17
 In the proceedings below, ABM initially moved for partial summary judgment. The district court denied that motion on the ground that the policy was "ambiguous in several pertinent respects." The trial court ordered discovery to resolve the ambiguities in the contract. At the close of discovery, ABM and Zurich both moved for partial summary judgment. ABM sought a declaration that its loss of income was covered by the BI provision or, alternatively, by the Leader Property provision. As before, Zurich's position was that the majority of ABM's lost business income was covered by the Contingent Business Interruption provision, and that coverage was unavailable under the BI, Extra Expense, Leader Property, and Civil Authority provisions.
 
 
 18
 On May 28, 2003 the district court granted Zurich's motion for partial summary judgment, finding the BI provision, as well as the other sources of coverage invoked by ABM, inapplicable to the majority of ABM's claims. The district court held that ABM could obtain BI coverage only for the income it lost resulting from "the destruction of the World Trade Center space that ABM itself occupied or caused by the destruction of ABM's own supplies and equipment located in the World Trade Center." Zurich Am. Ins. Co. v. ABM Indus., Inc., 265 F.Supp.2d 302, 305 (S.D.N.Y.2003). The court reasoned that the policy restricts BI coverage to "insured property at an insured location," and that the common areas and the tenants' premises in the WTC did not constitute insured property as that term is defined in the policy. Id. Specifically, the court held that ABM neither "used" nor "controlled" these areas in a manner that sufficed for the creation of a "legally cognizable `interest' in the property." Id. at 305-06. For the same reasons, the district court held that ABM could not recover under the related Extra Expense provision. Id. at 306-07. The court further held that ABM could not recover under any of the time element extensions, including the Civil Authority and Leader Property provisions. Id. at 307-09.
 
 
 19
 In a subsequent order dated August 4, 2003, the trial court effectively overruled its earlier decision that ABM was entitled to some BI coverage. The district court granted Zurich's motion to strike portions of the report of ABM's expert witness, Jerome Trupin, that "opine[d] on the extent of the business interruption loss suffered by [ABM] as a result of the `destruction of the World Trade Center space that ABM itself occupied' or as a result of `the destruction of ABM's own supplies and equipment located in the World Trade Center.'" Zurich Am. Ins. Co. v. ABM Indus., Inc., No. 01 Civ. 11200, slip op. at 1 (S.D.N.Y. Aug. 4, 2003). The district court reasoned that BI coverage under the policy "only insures against loss resulting directly from the necessary interruption of business caused by the destruction of insured property," and "the incidental destruction of the aforementioned items was not a material cause of the business interruption." Id. at 2.
 
 
 20
 Finally, on August 22, 2003, the district court granted Zurich's motion in limine seeking to bar ABM from presenting evidence in support of the theory that the WTC's destruction constituted two occurrences. The court was of the opinion that Zurich had proceeded on a one-occurrence theory and that ABM did not meet its burden to raise their alternative theory "in a way that would give fair notice to Zurich." The parties agreed to settle the remaining elements of the case, and the district court entered final judgment on January 20, 2004. This appeal followed.
 
 
 21
 We affirm the district court's evidentiary ruling, reverse its order granting summary judgment insofar as it held that ABM was not entitled to coverage under the Business Interruption clause of its insurance contract with Zurich, and vacate and remand to the district court the issues of Extra Expense and Civil Authority coverage. We believe that ABM's activities at the World Trade Center created an insurable interest cognizable under New York law, and that this insurable interest falls within the scope of the policy's coverage. We thus grant summary judgment in favor of ABM on the issue of Business Interruption coverage, and remand that issue for determination of ABM's damages to the district court. Because factual disputes surround the issues of Extra Expense and Civil Authority coverage, we remand those issues to the district court for further proceedings.
 
 DISCUSSION
 I Standard of Review
 
 22
 We review de novo the grant of Zurich's cross-motion for summary judgment and the denial of ABM's similar motion, and apply the same principles as required of the district court. Bishop v. Nat'l Health Ins. Co., 344 F.3d 305, 307 (2d Cir.2003). "[C]onstruing the evidence in the light most favorable to the non-moving party," we must determine whether any genuine issues of material fact would bar summary judgment. Scholastic, Inc. v. Harris, 259 F.3d 73, 81 (2d Cir.2001).
 
 
 23
 The legal principles applicable to this dispute are well-settled. With respect to a contract claim, a court may construe the contract and grant summary judgment when the contractual language is "plain and unambiguous." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 148-49 (2d Cir.1993). Whether contractual language is ambiguous is a question of law that we review de novo. See State Farm Fire & Cas. Ins. Co. v. Sayles, 289 F.3d 181, 185-86 (2d Cir.2002). Ambiguity exists when a contract is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir.1993).
 
 II Business Interruption Coverage
 
 24
 We think the district court failed to elucidate the natural and ordinary meanings of pertinent terms in the BI provision of the policy as they applied to all of the categories of property under which ABM is seeking BI coverage and thus erred in barring such coverage. We consider first the scope of BI coverage set out in § 7.B of the policy, which covers loss resulting from the interruption of business caused by damage "to insured property at an insured location." The scope of the BI provision is effectively delineated by § 7.A(1) of the policy, the Insurable Interest provision, which defines the scope of coverage as "[t]he interest of the Insured in all real and personal property including but not limited to property owned, controlled, used, leased or intended for use by the Insured."
 
 
 25
 In construing § 7.A(1), Zurich argues for application of the doctrine of ejusdem generis, a rule of statutory construction under which "general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114-15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). Under this principle Zurich maintains that a property interest such as ownership or tenancy is necessary for coverage regardless of the level of "use" or "control." Such a reading would require us to ignore the phrase "but not limited to" as well as the disjunctive "or" in the provision. Moreover, if a property interest were required under the contract, the terms "controlled," "used," and "intended for use" would be superfluous. In interpreting an insurance contract under New York law, a court must strive to "give meaning to every sentence, clause, and word." Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London, 96 N.Y.2d 583, 594, 734 N.Y.S.2d 531, 760 N.E.2d 319 (2001). Thus, we construe § 7.A(1) to require only an "insurable interest," the outer boundaries of which we delineate below, rather than finding that a "property interest" is a predicate to coverage.
 
 A. Common Areas, Tenants' Premises, and HVAC System
 
 26
 Because ABM did not "own" or "lease" the common areas and the premises of the other tenants, whether they "controlled," "used," or "intended to use" these areas is the relevant inquiry. We believe ABM "used" the common areas and the premises of the other tenants in the WTC within the meaning of the Insurable Interest provision. Hence, summary judgment for ABM is appropriate on this issue.
 
 
 27
 The district court defined "use" as "to carry out a purpose or action by means of." Zurich, 265 F.Supp.2d at 305 (quoting Webster's Third New Int'l Dictionary of the English Language (Unabridged) 2524 (2002)). The trial court concluded that ABM did not "use" the common areas and other tenants' premises in the WTC complex because it could accomplish its purpose of cleaning and earning income with "mop[s]" and "broom[s]." Id. Thus, according to the district court, the premises in question were "the locations of ABM's acts, not the means through which the acts were accomplished." Id.
 
 
 28
 We disagree with the district court's application of this definition. We think instead that the "plain meaning [of these words] unambiguously includes the actual situation for which coverage is sought." Coregis Ins. Co. v. Am. Health Found., 241 F.3d 123, 129 (2d Cir.2001). The existence and configuration of the common areas and tenants' premises were vital to the execution of ABM's business purpose. These areas and premises were the means by which ABM derived its income and were as essential to that function as ABM's cleaning tools. Following the definition cited by the trial court, ABM therefore "used" this property. Contrary to the district court's view, ABM's use of other items in accomplishing its purpose makes these areas of the complex no less important to ABM's tasks.
 
 
 29
 The conclusion reached by the court below that the common areas and leased premises in the WTC were merely the "locations" rather than the "means" of ABM's work not only overlooks the instrumentality of the property in ABM's processes, but categorically disfavors providers of physical labor. The furnishing of physical services usually entails entering the space of another. To deny ABM's loss-of-income coverage simply because its income is derived from labor that occurs outside of its own cubicles and offices artificially excludes service providers when the contract itself does not limit coverage in such a manner. The nature of ABM's business requires movement from its own leased spaces onto another's property.
 
 
 30
 To give an example, a reasonable person would not contest that a hypothetical accounting firm "uses" the offices it occupies. Such a person should also conclude a janitorial and electrical service provider "uses" the spaces it services because, in both situations, it is the space or property that engenders productivity. The district court erroneously held that ABM's usage was confined to the offices that ABM itself occupied. ABM, unlike the accounting firm, does not engage in predominantly mental labor and is thus prevented from working solely within the confines of its own offices. Its "usage" necessarily extends beyond those boundaries. It would be wrong to privilege the hypothetical accounting firm's, over ABM's, relationship with the property such that the former entity could be said to "use" the property while the latter would not. In other words, it makes no sense to deny that ABM "uses" these premises simply because they are also used by another when the nature of ABM's work compels this duality.
 
 
 31
 Further, even if ABM did not "carry out" their purpose of running a successful business through the common areas and leased offices in the complex, it can still be said that ABM "used" these areas following other common dictionary definitions of the term. Clearly, ABM "had recourse to" and "enjoyment of" these areas and indeed could avail itself of all areas of the World Trade Center where it performed operations. Webster's Third New Int'l Dictionary of the English Language (Unabridged) 2523 (2002). Additionally, ABM applied all areas of the WTC to its advantage, thus "put[ting]" the characteristics of the property "into action" and into its "service." Id. (defining the intransitive verb "use" as "to put into action or service: have recourse to or enjoyment of").
 
 B. Property Occupied by ABM
 
 32
 ABM also seeks BI coverage for income derived from property that it occupied, such as the "offices" and "warehouses" on site in which it stored equipment and conducted operations; its call center; and the freight elevators, janitorial closets, and slop sinks to which it had nearly exclusive access. Because ABM "used" and "controlled" the areas that it occupied as contemplated under the policy, we hold it is entitled to summary judgment on this issue of BI coverage.
 
 
 33
 ABM clearly availed itself of the property that it occupied to facilitate its income-producing activities and thus "used" this property. And while exclusive access to an area is not necessary to "control" that area, exclusivity strongly supports the conclusion that "control" exists. ABM's privileged relationship with, and management of, its offices, storage spaces, freight elevators, closets, and sinks indicates that it exerted power and directed influence over these premises. Therefore, ABM "controlled" its occupied properties. See Webster's Third New Int'l Dictionary of the English Language (Unabridged) 496 (2002) (defining the verb "control" as "to exercise restraining or directing influence over: ... have power over").
 
 
 34
 Although ABM "used" and "controlled" this category of property, the district court held that it could not recover under the BI provision because "[t]he undisputed cause of the interruption here was the destruction of the World Trade Center, which would have totally interrupted the ABM business here in issue regardless of what happened to the freight elevators, loading docks, etc." Zurich, No. 01 Civ. 11200, slip op. at 2. We cannot agree with the district court's approach to the causation issue because it artificially severs the chain of events occurring on September 11. Since the destruction of the WTC and the properties owned by ABM were obviously simultaneous, the destruction of ABM's occupied property was not "incidental to" the destruction of the WTC, as concluded by the district court, because this property was part of the complex. Accordingly, the ruination of the WTC, including the property at issue, was the cause of ABM's business interruption. Contrary to the district court's view, ABM's failure to have an interest in the entire WTC does not bar its claim for lost income due to the destruction of a portion of the WTC.
 
 C. Supplies and Equipment
 
 35
 ABM also avers that the district court's August 4, 2003 decision foreclosed it from claiming BI coverage for damage to any property, including its supplies and movable equipment. This portion of the BI claim, however, was never at issue in the declaratory judgment action and thus is not a subject of this appeal.
 
 D. Insurable Interest
 
 36
 Given that, in our view, ABM "used" and "controlled" property in the WTC and thereby acquired a BI claim, we next examine the district court's conclusion that even if ABM "used" or "controlled" the common areas and the premises of other tenants, its activities did not rise to the level necessary to create a "legally cognizable `interest'" in the property. Zurich, 265 F.Supp.2d at 306. In light of ABM's substantial influence over, and availment of, the WTC infrastructure to develop its business, it is difficult to imagine what would constitute a "legally cognizable `interest' in the property," apart from ownership or tenancy. The terms of the insurance policy, however, do not limit coverage to property owned or leased by the insured. To the contrary, the policy's scope expressly includes real or personal property that the insured "used," "controlled," or "intended for use."
 
 
 37
 The district court's imposition of the "legally cognizable `interest' in the property" requirement is an impermissible hurdle to insurance coverage, contemplated by neither the parties nor the New York legislature. The only prerequisite to coverage mandated by New York law is that an entity have an "insurable interest" in the property it insures. New York law embraces the sui generis nature of an "insurable interest" and statutorily defines this term to include "any lawful and substantial economic interest in the safety or preservation of property from loss, destruction or pecuniary damage." N.Y. Ins. Law § 3401 (2002). ABM's income stream is dependent upon the common areas and leased premises in the WTC complex, and thus ABM meets New York's requirement of having an "insurable interest" in that property.
 
 
 38
 The prophylactic function of the "insurable interest" requirement is not destroyed by its breadth. Zurich asserts that extending ABM's insurable interest to include the common areas and leased premises would mean that ABM has direct damage coverage for these areas — "an absurd result." To the contrary, ABM does not have and does not claim to have an insurable interest in these properties for the purpose of direct damage coverage because it suffered no direct pecuniary loss of asset value. The insurable interest requirement thus avoids absurd results by protecting only that in which ABM has a financial stake — its future stream of income.
 
 
 39
 Zurich further contends that ABM's interest is only derivative from the property, and that it does not constitute a direct interest in the property itself. In so arguing, Zurich unsuccessfully seeks to amend the text of N.Y. Ins. Law § 3401 by narrowing the definition of an insurable interest. The outer reaches of an interest that can be insured clearly encompass an indirect economic interest in the property. Such an interest can be insured if, as is the case here, it falls within the definitional boundaries set by the insurance policy.
 
 E. Contingent Business Interruption Coverage
 
 40
 In ascertaining the extent of an insured's coverage under an insurance policy, we look to the entire contract to determine "its purpose and effect" and the "apparent intent of the parties." Maryland Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 161 (2d Cir.2003). While the meaning of a term or provision may be clear when read in isolation, its interaction with other parts of the policy may infuse it with ambiguity. Accordingly, it is necessary to address whether the operation of other provisions in the policy cast doubt upon ABM's BI coverage. Zurich's position is that the Contingent Business Interruption provision at § 7.F(2) of the policy, rather than the BI provision, covers ABM's lost income up to its $10 million sublimit. The insurer urges that because the CBI provision extends the scope of coverage beyond that provided by the BI provision, property covered by the former falls outside the scope of the latter. While we agree that the CBI provision is an extension of the BI coverage, we disagree that it applies to the circumstances here.
 
 
 41
 CBI coverage is a relatively recent development in insurance law and its scope has not yet been fully delineated by the courts. Entities that rely on "third parties" sometimes purchase CBI coverage as a policy extension in case their income is disrupted by damage to third party property. Gavin Souter, Risks From Supply Chain Also Demand Attention, Bus. Ins. 26 (May 15, 2000). These provisions typically provide coverage to enumerated dependent properties such as "those who supply materials for the insured, purchase the insured's goods, or attract customers to the insured's business." Paula B. Tarr, Where Have All The Customers Gone? Business Interruption Coverage For Off-Premises Events, 30 The Brief 20, 29 (Winter 2001); see Archer Daniels Midland Co. v. Hartford Fire Ins. Co., 243 F.3d 369, 371 (7th Cir.2001) ("Regular business-interruption insurance replaces profits lost as a result of physical damage to the insured's plant or other equipment; contingent business-interruption coverage goes further, protecting the insured against the consequences of suppliers' problems.").
 
 
 42
 By its express terms, the CBI provision of the policy covers business interruption due to loss or damage to properties "not operated by the Insured," that is to say, it insures against events that prevent entities from supplying goods to, or receiving goods from, the insured. The relevant inquiry, then, is whether ABM "operated" the properties at issue in this action. We hold that through its operation of the infrastructure of the WTC, appellant also operated the physical spaces occupied by itself and other tenants as well as those shared with the public.
 
 
 43
 The transitive verb "to operate" has the following meanings: "1: to cause to occur, ... 2 a: to cause to function usu[ally] by direct personal effort, ... b: to manage and put or keep in operation whether with personal effort or not." Webster's Third New Int'l Dictionary of the English Language (Unabridged) 1581 (2002). Among its many activities at the WTC, ABM directed and maintained the HVAC system and freight elevators. It effectively ran the entire physical plant. Appellant handled the upkeep and maintenance of the infrastructure itself, including the leased premises of other tenants and the common areas. Any work done in or on the tenants' premises had to be cleared through ABM. Moreover, ABM developed and executed new technologies that ensured that the complex ran smoothly. Using these direct efforts, appellant "caused" the properties at issue in the WTC "to function." In this respect, the insured effectively served as a management company for the WTC, partnered with other entities responsible for the complex's finances. It is true that ABM did not operate the businesses that leased space at the WTC, nor did it dictate the usage of the common areas. But the policy requires only that ABM operated the physical structures themselves, a hurdle it clearly meets through its extensive involvement with the property.
 
 
 44
 Further, ABM's operation of the WTC need not be exclusive. "The word `operate' has varying meanings according to the context.... One may operate singly with [one's] own hands, or jointly with another, or through one or more agents." State Farm Mut. Auto. Ins. Co. v. Coughran, 303 U.S. 485, 491, 58 S.Ct. 670, 82 L.Ed. 970 (1938). In Coughran, the Court held that the term "operated" could refer not only to the actions of a motor vehicle owner's wife, who was riding in and responsible for the vehicle, but also to those of a 13- year-old girl, who was driving under the wife's direction and guidance. Id. at 491-92, 58 S.Ct. 670. Here, ABM ran the physical aspects of the complex, including the upkeep and maintenance of the common areas and tenanted spaces. Although it did so through contracts with the Port Authority, Silverstein Properties, and other tenants, under Coughran, the presence of these other entities and the joint decision-making involved did not detract from ABM's "operation" of the property. See Potts v. Cont'l Cas. Co., 453 F.2d 276, 278 (9th Cir.1971) (holding that an insurance policy provision, which excluded coverage when the insured was flying on an airplane "operated by" his employer, applied even though the airplane was owned by another entity and on a short-term lease to the employer).
 
 
 45
 We cannot adopt Zurich's contention that if ABM is said to operate its customers' premises and the common areas, then "there would never be an instance in which ABM would need CBI coverage." Outside of the present situation, there exists a host of scenarios where CBI coverage would benefit ABM, including damage to the property of ABM's suppliers, its intermediaries, or its customers outside of the complex. We recognize that CBI coverage usually encompasses destroyed property of the insured's customers, and the tenants here were "direct receiver[s] of .... services from the Insured" as contemplated under the CBI provision in § 7.F(2). Yet the case before us involves a unique set of circumstances where the insured's customers occupied a building that the insured itself operated, thus rendering the CBI provision inapplicable.
 
 III Other Relevant Policy Provisions
 
 46
 We turn now to analyze other relevant provisions of the policy.
 
 A. Extra Expense Coverage
 
 47
 Section 7.C insures against certain costs incurred from the loss, damage, or destruction of property as described in the "Insurable Interest" provision. ABM sought reimbursement under this provision for extra expenses that it contends resulted from the destruction of the WTC, such as increased employee costs related to seniority displacements of employees in other buildings, state unemployment obligations, and employee termination costs.
 
 
 48
 The scope of the Extra Expense provision is limited to that of the Insurable Interest provision, and § 7.C(1) states that extra expenses must result from damage or destruction to "real or personal property as described in Clause 7.A." The district court held that ABM could not claim coverage under the Extra Expense provision because the "extra expenses incurred by ABM resulted from the destruction of property that was not `owned, controlled, used, leased or intended for use' by ABM." Zurich, 265 F.Supp.2d at 307. We disagree with the district court's interpretation and application of the Insurable Interest provision in regard to the BI issue for the reasons stated above, and accordingly disagree with its Extra Expense holding. We concluded a moment ago that ABM "used" and "controlled" the damaged property to the extent required by the policy and New York law. Thus, we cannot uphold the district court's award of summary judgment to Zurich on these grounds.
 
 
 49
 Nonetheless, Zurich insists that even if ABM has suffered a loss as described in § 7.A, the expenses claimed by it are still not covered under the Extra Expense provision. Zurich argues that the provision limits coverage to expenses from "continuing operations that were made more costly as a result of damage to the insured's property" rather than "loss of income resulting from the suspension of business operations." The language of the provision in the policy has no such limitation. Its terms require only that the extra expense relate to the "operation of the Insured's business" over and above the costs normally incurred by the business, not that the insured resume operations identical to those prior to the loss. Nor does the contract provision limit coverage to losses stemming directly from the location that sustained damage. Inasmuch as the provision is not otherwise limited, we think it applies when continuation of the business occurs at a substitute location.
 
 
 50
 It is not clear at this point, however, that summary judgment in ABM's favor is appropriate on the Extra Expense issue because there is no finding as to the causation requirement. The policy language requires that extra expenses "result[] from" a covered incident. A causation requirement is a fundamental aspect of an insurance policy because it allows an insurer to "have a reasonably defined universe of possibilities to which it can apply its risk analysis methods ... and determine a premium." Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 101:40 (3d ed.1998). Hence, on remand, we direct the district court to make findings as to whether the extra expenses claimed by ABM were proximately caused by the peril insured against.
 
 B. Civil Authority Coverage
 
 51
 Appellant has also made claims for its losses of business income resulting from the issuance of civil authority orders that, it argues, prevented it from operating at its numerous downtown locations. The "Civil Authority" section of the policy, § 7.F(5), "cover[s] the loss sustained during the period of time when access to real or personal property is impaired by order or action of civil or military authority issued in connection with or following a peril insured against."
 
 
 52
 The district court denied Civil Authority coverage on the ground that the insured's loss of business income was caused by the destruction of the WTC, and thus would have occurred even if no orders of civil authorities prohibited access to the WTC. Zurich, 265 F.Supp.2d at 309. We are unable to agree with this reasoning because the loss of income that appellant seeks under this provision is from its interruption of business at its 34 non-WTC locations. As a consequence, the destruction of the WTC, unaccompanied by the orders, would not have resulted in the loss of income for which ABM seeks reimbursement under the Civil Authority provision.
 
 
 53
 Nonetheless, a factual dispute remains with respect to whether the civil orders or ABM's own company policies impaired its access to the properties it serviced. The issue of Civil Authority coverage must therefore be remanded to the district court for further consideration.
 
 C. Leader Property Coverage
 
 54
 Lastly, ABM asserts that if BI coverage is unavailable, then alternatively its losses of business income from the destruction of the WTC are covered by the Leader Property provision which applies to losses "to property not owned or operated by the Insured, located in the same vicinity as the Insured, which attracts business to the Insured." We affirm the district court's grant of summary judgment to Zurich on the issue of Leader Property coverage, although on different grounds than it relied upon. The trial court ruled the WTC was not a "`leader property' in the `vicinity' of ABM which `attracts business' to ABM, but rather is itself the site and source of the ABM business here at issue." Zurich, 265 F.Supp.2d at 308. We reject the notion that a property cannot "attract" business to another entity at the same site, or adjacent to it. The district court's refutation of this possibility rests on an overly literal interpretation of the word "attracts." Economic forces need not act in the same physical fashion as does a magnet attracting metal. Indeed, it was the interconnectedness of the WTC complex that "attracted" its tenants to ABM's services by providing an opportunity for ABM to exploit economies of scale.
 
 
 55
 Nonetheless, we conclude that Leader Property coverage is inappropriate in this case. As discussed above, ABM "operated" the infrastructure of the complex, including the common areas and tenanted premises. As such, the situation here does not fall within the language of § 7.F(4) of the policy which covers "properties not owned or operated by the insured." Accordingly, the award of summary judgment to Zurich on this issue must be affirmed.
 
 IV Zurich's Motion to Exclude Evidence
 
 56
 Finally, in addition to challenging the award of summary judgment to Zurich, ABM also contends that the district court erred in excluding evidence that supported a two-occurrence claim. Evidentiary rulings ordinarily will not be overturned absent an abuse of discretion. See Am. Fed. Group, Ltd. v. Rothenberg, 136 F.3d 897, 904 (2d Cir.1998); In re Martin-Trigona, 760 F.2d 1334, 1344 (2d Cir.1985) (evidentiary rulings generally not to be disturbed unless" `manifestly erroneous'") (quoting Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). Even an erroneous ruling will not lead to reversal unless affirmance appears to the Court to be "inconsistent with substantial justice," Fed.R.Civ.P. 61, or the exclusion affects a substantial right of the party. Fed.R.Evid. 103(a).
 
 
 57
 We affirm the district court's grant of Zurich's motion in limine to bar ABM from asserting a two-occurrence theory and agree with the reasons the district court gave during the evidentiary hearing. Because Zurich proceeded on a theory of one occurrence in its original and amended complaints, the trial court reasoned that the burden to contest this theory shifted to ABM.
 
 
 58
 ABM relies on Gaetan v. Firemen's Ins. Co., 264 A.D.2d 806, 808, 695 N.Y.S.2d 608 (2d Dep't 1999), for the proposition that the insurance company bears the burden of proving exclusionary language. However, per-occurrence limitations define the scope of coverage and are not policy exclusions. See Worcester Ins. Co. v. Bettenhauser, 95 N.Y.2d 185, 189, 712 N.Y.S.2d 433, 734 N.E.2d 745 (2000) (noting the line drawn by New York courts "between a lack of coverage in the first instance and a lack of coverage based on an exclusion"). Further, Gaetan is inapplicable to the case at hand because it only addresses the question of who has the burden of proof rather than the burden of raising the issue. Even if Zurich has the burden of raising the issue, it has met this burden by invoking the per-occurrence limits. Zurich's complaint presumed one occurrence by explicitly stating that it was seeking a declaration that liability was limited to $10 million. The burden then shifted to ABM to contest the number of occurrences.
 
 
 59
 Moreover, it was not an abuse of the trial court's discretion for it to rule that ABM failed to contest the one-occurrence exclusion in a way that would give fair and timely notice to Zurich. Appellant did not raise the issue in its responsive pleadings even though its counterclaim refers to the $10 million per-occurrence sublimit. In fact, a witness for ABM stated that ABM had not yet taken a position on the issue because it thought its limits were adequate. Additionally, in its damage computations, ABM did not assert that its damages were premised on a two-occurrence claim. ABM now argues that it raised the issue in its motion papers for partial summary judgment, but these motions only included a footnote stating that ABM would be entitled to $10 million "for each occurrence." This footnoted mention of the sublimit does not sufficiently raise the issue. See United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir.1993) (holding that an argument noted only in a footnote is not preserved for appellate review).
 
 
 60
 The district court was unpersuaded by ABM's argument that the claim should be permitted, even if untimely, because no prejudice would result from allowing the claim. Rule 403 of the Federal Rules of Evidence states in part that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. The trial court has broad discretion in determining whether proffered evidence should be admitted. See United States v. Robinson, 560 F.2d 507, 514-15 (2d Cir.1977) (en banc). Even if the occurrence issue is a matter of law, the determination of the harm flowing from each occurrence would require considerable discovery. Because discovery was closed and trial was approaching, the district court could reasonably conclude that Zurich would be substantially prejudiced by the introduction of the new claim and did not abuse its discretion in refusing to consider it.
 
 CONCLUSION
 
 61
 Accordingly, for the foregoing reasons, we affirm the district court's grant of Zurich's motion in limine excluding evidence on ABM's two-occurrence theory as well as the district court's denial of Leader Property coverage. We reverse the district court's May 28, 2003 order granting summary judgment in favor of Zurich and award summary judgment in favor of ABM on its claims for Business Interruption coverage. Further, we vacate and remand the remaining issues of Extra Expense coverage, Civil Authority coverage, and damages to the district court for further proceedings not inconsistent with this opinion.
 
 
 62
 Affirmed in part, reversed in part, vacated and remanded, in part.
 
 
 
 Notes:
 
 
 *
 Judge Wilfred Feinberg recused himself prior to the time of oral argument. The two remaining members of the panel have decided this appeal pursuant to § 0.14(b) of Rules of Court