**DUANE READE, INC., Plaintiff,**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY, Defendant.**

No. 02 CIV. 7676(JSR).

United States District Court, S.D. New York.

Aug. 20, 2003.

James W.B. Benkard, Esq., Carolina C. De Onis, Esq., Michael Farbiarz, Esq., Davis Polk & Wardwell, New York City, for Plaintiff.

Michael S. Levine, Esq., Lon A. Berk, Esq., Erik Matthew Figlio, Esq., John P. Malloy, Esq., Charles A. Cowan, Esq., Edward J. Grass, Esq., Shaw Pittman, LLP, McLean, VA, for Defendant.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Confirming the Court's telephonic rulings of June 13, 2003 and letter to counsel dated July 8, 2003, defendant's motion for summary judgment is denied in its entirety and plaintiff's motion for summary judgment is granted in part and denied in part, as set forth below. Additionally, defendant's motion to submit the "number of years" calculation to an appraiser is granted.

By way of background, this case concerns insurance coverage for a drugstore (the "WTC store") that plaintiff Duane Reade, Inc. ("Duane Reade") operated in the retail concourse of the World Trade Center prior to September 11, 2001. After the World Trade Center was destroyed, Duane Reade sought to recover under an insurance policy (the "Policy") issued by defendant St. Paul Fire & Marine Insurance Company ("St.Paul"). When the parties were unable to resolve a dispute concerning the scope of the Policy's coverage for "business interruption losses," Duane Reade brought this action, seeking both declaratory relief as to the scope of coverage and damages for breach of contract. St. Paul responded by moving to dismiss all the claims, but while the Court dismissed the contract claims as premature (because no proof of loss had been filed), it allowed the declaratory judgment claims to proceed. *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F.Supp.2d 293 (S.D.N.Y.2003).[1]

---

1. On June 25, 2003, after Duane Reade had filed a proof of loss, the Court gave Duane

Following discovery, the parties each moved for summary judgment. Their submissions show that St. Paul does not dispute that the destruction of the WTC store was caused by a covered peril. Indeed, St. Paul has already satisfied Duane Reade's property loss claims. Moreover, although St. Paul now disputes that any monies are due for business interruption losses, previously, in May of 2002, St. Paul paid Duane Reade $9,863,853 to cover what it then perceived to be Duane Reade's business interruption losses.[2]

Nonetheless, genuine disputes remain over the scope of the business interruption coverage, some of them resolvable as a matter of law. The Policy as a whole covers losses at all Duane Reade stores for the period between October 1, 2000 and October 1, 2001 and has a coverage limit of $150 million. The provision dealing with business interruption losses extends coverage to:

> [t]he interest of the Assured in loss of earning (Business Interruption), including ordinary payroll, continuing expenses, loss of royalties and bonus programs as a result of an interruption of the Assured's business (either partial or total) if such interruption is a result of peril, not excluded under this policy, causing direct physical loss or damage to any Real or Personal Property whether insured or not ... including but not limited to loss or damage to ... property of the Assured, ... and property of customers, property of customers of customers.

Declaration of Erik M. Figlio, dated April 11, 2003 ("Figlio Decl."), Ex. A (Policy), at 4. Such coverage, however, does not extend into the indefinite future but is limited by "Restoration Period" clauses, which provide in relevant part as follows:

**PERIOD OF RESTORATION AND/OR INDEMNITY**

> The measure of recovery or period of indemnity shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such property that has been destroyed or damaged, and shall commence with the date of such destruction or damage and shall not be limited by the date of expiration of this policy.

> \*　　\*　　\*　　\*　　\*　　\*

> *Resumption of Operations:* As soon as practicable after any loss, the Assured shall resume complete or partial business operations and reduce or dispense with such additional charges and expense as are being incurred.

> \*　　\*　　\*　　\*　　\*　　\*

> *Extended Recovery Period*

> This policy is extended to cover the Actual Loss Sustained by the Assured resulting from interruption of business for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Assured's business to the condition that would have existed had no loss occurred,

---

Reade leave to re-assert its breach of contract claims. St. Paul then filed a second motion to dismiss, arguing that although a proof of loss had been filed, the valuation aspects of the breach of contract claims had to be submitted to an appraiser before Duane Reade could recover damages. Agreeing with St. Paul on that point, the Court once again dismissed the breach of contract claims, without

prejudice, as unripe. *See* Transcript of Hearing, July 23, 2003; Order dated July 23, 2003.

**2.** This latter amount was calculated by assuming that a "replacement" for the WTC store could have been opened for business within nine months of the terrorist attacks. *See* Affidavit of James W.B. Benkard, sworn to April 11, 2003, Exhibit Q (Claim History Report).

commencing with the latter [*sic* ] of the following dates:

a) the date on which liability of the Company of loss resulting from interruption of business would terminate if the clause had not been attached to this policy or

b) the date on which repair, replacement, or rebuilding of such part of the property as has been damaged is actually replaced, but in no event for more than twelve months from said later commencement date.

*Id.* at 17–21. Also, the Policy specifically excludes coverage for "loss or damage caused by . . . loss of market[.]" *Id.* at 9.

■ The principal coverage issue presented by the instant motions concerns how these clauses should be interpreted in determining the length of the Restoration Period applicable to the WTC store.[3] Specifically, Duane Reade argues that the Policy should be read to provide that

> the Restoration Period consists of the actual time period that would, or will, be required to restore Duane Reade's operations to the kind, quality, and level which existed at the WTC Store prior to the terrorist attacks and that such Restoration Period is coterminous with the time necessary to rebuild the complex

which will replace the World Trade Center.

Complaint at ¶ 39. St. Paul, by contrast, argues that the Restoration Period terminated when, at a time already past, Duane Reade could have "restored operations" at locations other than the World Trade Center. *See* St. Paul Fire & Marine Ins. Co.'s Memorandum in Support of its Motion for Summary Judgment, dated April 11, 2003, at 11.

The Court concludes, however, that neither side's interpretation accords with the plain language of the Policy, which governs as a matter of law. The "property" referred to is, unambiguously, the specific premises at which Duane Reade operated its WTC store. St. Paul's competing interpretation, *viz*, that the word "property" refers not to a store in any particular location, but to the "business" of the entire Duane Reade chain,[4] finds no support in the text of the Policy and, indeed, is manifestly unreasonable. As St. Paul would have it, either Duane Reade never suffered any business interruption at all because the chain was able to "stay open for business," St. Paul Fire & Marine Ins. Co.'s Memorandum in Opposition to Duane Reade, Inc.'s Motion for Summary Judgment, dated April 25, 2003, at 12, or the period of restoration ended when Duane

---

3. In its fourth claim for relief, Duane Reade seeks a declaration of coverage for business interruption losses suffered at other, non-WTC Duane Reade stores that were closed on September 11, 2001 for brief periods of time. The Court has already ruled that this cause of action survives St. Paul's summary judgment motion, *see* Transcript of Hearing, May 9, 2003, at 8, and the matter will be tried by the Court beginning September 3, 2003.

4. *See, e.g.*, St. Paul Fire & Marine Ins. Co.'s Memorandum in Support of its Motion for Summary Judgment, dated April 11, 2003, at 11 ("[T]he question is not whether [Duane Reade] has restored operations at the WTC complex. The question is whether it has re-

stored operations somewhere."); *id.* at 11 n. 5. In this connection, St. Paul also suggests that, alternatively, the period of restoration should last only so long as it would take Duane Reade to build a "replacement" store somewhere in the vicinity of the former World Trade Center. *See* St. Paul Fire & Marine Ins. Co.'s Memorandum in Opposition to Duane Reade, Inc.'s Motion for Summary Judgment, dated April 25, 2003, at 12. But such an interpretation would also be unreasonable, since, again, it finds no support in the plain language of the Policy and since it would render superfluous the other clauses requiring mitigation of damages.

Reade's chain-wide sales attained pre-peril levels, *see* St. Paul Fire & Marine Ins. Co.'s Memorandum in Support of its Motion for Summary Judgment, dated April 11, 2003, at 12–13. But this would mean that Duane Reade purchased coverage that either (1) only applies when every last one of its stores is destroyed, or (2) unlike all other business interruption insurance, *see* Couch on Insurance, 3d Ed., § 167:9, does not protect against lost profits. Neither alternative makes sense.

Likewise, Duane Reade's contention that the Restoration Period must be coterminous with the time actually required to rebuild the entire complex that will replace the World Trade Center is untenable. On their face, the Restoration Period clauses envision a hypothetical or constructive (as opposed to actual) time frame for rebuilding, as evidenced, for example, by their use of the subjunctive "would." *See* the Court's letter dated July 8, 2003, at 1. Moreover, what is to be hypothesized is the time it would take to rebuild, repair, or replace the WTC store itself, not the entire complex that once surrounded it. *Id.* at 2. Once Duane Reade could resume functionally equivalent operations in the location where its WTC store once stood, the Restoration Period would be at an end. *Id.* Any losses continuing beyond that point would be addressed by the "Extended Recovery Period" provision in the Policy, *see* Policy (Figlio Decl., Ex. A), at 21, not by the Restoration Period clause.

A further limitation to the hypothesized period of reconstruction results from the provision in the Policy mandating that losses be calculated with "due consideration" both to the experience of the WTC store prior to the loss as well as the "probable experience thereafter had no loss occurred." *Id.* at 19; *see Hawkinson Tread Tire Serv. Co. v. Indiana Lumbermens Mut. Ins. Co.*, 362 Mo. 823, 245 S.W.2d 24,

28–29 (1951) (construing a similar provision). "Probable experience" includes, *inter alia*, the likelihood *vel non* that Duane Reade's lease for the WTC store would have been renewed. Thus, if Duane Reade is unable to prove at trial that its lease of the WTC store would likely have been renewed absent the events of September 11, 2001, then the period of restoration cannot extend beyond December 31, 2007—the date on which Duane Reade's present lease term ends.

The parties' cross-motions raise two other issues: (1) whether coverage is barred in any event by the "loss of market" exclusion in the Policy; and (2) whether St. Paul's first counterclaim and sixth affirmative defense, both of which allege that Duane Reade misrepresented and/or concealed material facts, can be survive summary judgment. Both questions must be answered in the negative.

As to the first issue, St. Paul—relying exclusively on supposed "admissions" by Duane Reade representatives (*e.g.*, "the 9–11 attack deprived us of a marketplace," Figlio Decl., Ex. C (Transcript of Deposition of Anthony Cuti, taken April 3, 2003), at 412)—contends that the loss of market exclusion contained in the Policy bars coverage for Duane Reade's business interruption losses, since the terrorist attack destroyed not just the World Trade Center but the entire downtown market. The argument lacks substance. First, a careful reading of the context of the alleged "admissions" shows that they do not remotely purport to reach the conclusion that St. Paul ascribes to them; nor do they even appear to constitute admissible evidence, since they lack the necessary foundation and, even taken most favorably to St. Paul, suffer from excessive vagueness. Additionally, St. Paul has already foregone the argument it here makes, for it neither disputes that the destruction of

the WTC store was caused by a covered peril, *see* St. Paul Fire & Marine Ins. Co.'s Statement in Opposition to Plaintiff Duane Reade Inc.'s Local Rule 56.1 Statement in Support of its Motion for Summary Judgment, dated April 25, 2003 ("St. Paul Opp. 56.1 Stat."), at ¶ 36, nor disputes that the interruption in the business of that store was caused by the same covered peril. In fact, defense counsel represented during oral argument that "there was indeed an interruption as a result of ... a covered peril." Transcript of Hearing, May 9, 2003, at 23. The loss of market exclusion relates to losses resulting from economic changes occasioned by, *e.g.*, competition, shifts in demand, or the like; it does not bar recovery for loss of ordinary business caused by a physical destruction or other covered peril. *See, e.g., Boyd Motors Inc. v. Employers Ins. of Wausau,* 880 F.2d 270 (10th Cir.1989).

■ As to the second issue, St. Paul contends that the Policy is rendered void by any concealment or misrepresentation on the part of the insured [5] and that Duane Reade, in connection with its submissions that occasioned the initial $9.86 million payment for business interruption coverage, concealed from St. Paul: (a) data purportedly showing that it had mitigated its damages by increased use of other stores in the vicinity, and (b) that it had hired a third-party consultant, Deloitte & Touche, to review the loss figures originally prepared by its accountant and presented to St. Paul in connection with obtaining the initial payment.

As to the former, however, St. Paul has expressly admitted that in determining the amount of its initial payment to Duane Reade for business interruption, it consciously chose "to ignore mitigation and chose not to complete a detailed analysis of [Duane Reade's] claim in order to expeditiously arrive at settlement." St. Paul Opp. 56.1 Stat. at 6 ¶ 26–34. Thus, the allegedly concealed data were immaterial for the proffered purpose and occasioned no reliance. *See also* Affidavit of James W.B. Benkard, sworn to April 11, 2003, Ex. M (Transcript of Deposition of Gerald W. Warshaw, taken on February 24, 2003), at 77:11–18; 99; 123:19–124:6. When settlement fell through and St. Paul, though choosing to advance the initial payment, disputed Duane Reade's broader interpretation of the Policy, this litigation ensued, at which point St. Paul requested, and received, the data relating to mitigation.

■ The same absence of materiality and reliance attaches to Duane Reade's alleged failure to disclose the third-party review of its accountant's initial loss calculation. According to an email from an employee of Duane Reade's broker, while Deloitte & Touche "approved" the accountant's numbers, it believed the accountant's approach "was even more aggressive than the one [Deloitte & Touche] came up with." Declaration of Charles A. Cowan, sworn to on April 25, 2003, Exhibit M (Email from Rolanda Little to Dan Frio, dated January 2, 2002), at 1. St. Paul implies (without quite arguing) that, had it known of Deloitte & Touche's review, it

---

**5.** This argument rests in part on a clause contained in a page attached to the front of the Policy. The clause, which appears below the heading "Conditions," provides that the Policy "shall be void if the Insured has concealed or misrepresented any material [facts] or circumstances concerning this insurance or the subject thereof or in case of any fraud,

attempted fraud or false swearing ...." Policy (Figlio Decl., Ex. A), at second page. Duane Reade asserts that St. Paul waived this alleged condition when it agreed to a waiver provision contained in the body of the Policy itself. The Court assumes, *arguendo*, that St. Paul's construction of the Policy is the correct one.

would never have paid Duane Reade the initial $9.86 million.

However, the fact of the review itself would not support this conclusion if Deloitte & Touche had simply "approved" the accountant's numbers. Thus, the only arguably material fact would be the reference to Deloitte's alleged conclusion that the accountant's approach was "aggressive."[6] Yet the sole proffered evidence of this supposed qualification, *i.e.*, the aforementioned email, is inadmissible, being both double hearsay and hopelessly vague.[7]

Moreover, St. Paul has previously acknowledged that the accountant's report was of such a preliminary nature that it could not substitute for a formal proof of loss, *see* Defendant St. Paul Fire and Marine Ins. Co.'s Reply in Support of its Motion to Dismiss and to Compel Appraisal, dated March 10, 2003, at 5, thus making clear St. Paul's lack of reliance thereon. *See, e.g., Elghanian v. Harvey,* 249 A.D.2d 206, 671 N.Y.S.2d 266 (1st Dept.1998). Finally, under New York law, even where a misrepresentation/fraud clause like the one here at issue is involved, the insurer must prove that the insured concealed material facts *with an intent to defraud. See, e.g., Jonari Mgmt. Corp. v. St. Paul Fire & Marine Ins. Co.,* 58 N.Y.S.2d 408, 416–17, 461 N.Y.S.2d 760, 448 N.E.2d 427 (1983).

St. Paul has not presented any competent evidence from which such an intent could be reasonably inferred.

■ Turning to St. Paul's motion to have the Policy-provided appraisers (as opposed to the Court or a jury) determine the duration (in years and months) of the Restoration Period, the Court agrees with St. Paul that such calculation falls within the appraisers' purview. Pursuant to the parties' agreement, and as a general matter under New York law, questions concerning valuation of the loss, as opposed to coverage under the Policy, must be submitted to appraisal. *See Kawa v. Nationwide Mut. Fire Ins. Co.,* 174 Misc.2d 407, 664 N.Y.S.2d 430, 431 (N.Y.Sup.Ct.1997); *see also, e.g., Zar Realty Management Corp. v. Allianz Ins. Co.,* No. 02 Civ. 6741, 2003 WL 1744288, at *4 (S.D.N.Y. Mar. 31, 2003); *Indian Chef, Inc. v. Fire and Cas. Ins. Co.,* No. 02 Civ. 3401, 2003 WL 329054, at *3 (S.D.N.Y. Feb. 13, 2003). Although defining what was meant by the Restoration Period was a coverage issue, *see Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,* 261 F.Supp.2d 293 (S.D.N.Y.2003), now that that has been accomplished, the estimation of that period in order to help value the loss is a matter of valuation, not coverage. Indeed, it is part of the kind of appraising that real

6. St. Paul also makes reference in its papers to a cryptic, two-page outline entitled "Duane Reade 9/11 Claim Review/Discussion Points," *see* Declaration of Charles A. Cowan, dated April 25, 2003, Ex. S, and asserts that this document, which was prepared by Deloitte & Touche consultant Paul Lux, "outline[s] significant defects" in Duane Reade's initial claim figures. *See* St. Paul Fire & Marine Ins. Co.'s Memorandum of Law in Opposition to Duane Reade, Inc.'s Motion for Summary Judgment, dated April 25, 2003, at 24. But this assertion entirely mischaracterizes the outline; consistent with its title, all the document does is list a few preliminary points and questions for discussion with Duane Reade

executives. *See id.; see generally* Transcript of the Deposition of Paul Lux, taken on May 5, 2003 (explaining the inquisitive nature of his observations). The document simply does not support St. Paul's argument that Deloitte & Touche disapproved of Duane Reade's initial claim numbers or otherwise concluded that they were defective.

7. Moreover, the Deloitte & Touche representative who actually reviewed the accountant's figures does not recall ever having stated that the figures were "aggressive." *See* Transcript of Deposition of Paul Lux, taken May 5, 2003, at 76:9–11.

estate, business, and insurance appraisers regularly undertake. Thus, although there is no New York case exactly in point, the entire thrust of the foregoing cases is to leave this kind of determination to the appraisers.

In sum, for the foregoing reasons, St. Paul's motion for summary judgment is denied in its entirety, and Duane Reade's motion for summary judgment us granted to the extent of dismissing St. Paul's second counterclaim and fourth and thirteenth affirmative defenses (which assert that coverage is barred by virtue of the loss of market exclusion or other, unidentified exclusions) and dismissing St. Paul's first and third counterclaims and sixth affirmative defense (which allege misrepresentation and/or concealment). In addition, because St. Paul has not adduced any evidence that Duane Reade has waived its claims or that those claims are barred by laches or the doctrine of unclean hands, St. Paul's twelfth affirmative defense (raising these defenses) is likewise dismissed. *See* Amended Answer, Affirmative Defenses and Counterclaim, dated January 31, 2003. Further, the scope of the business interruption coverage is resolved, not as requested by either party, but as set forth in this Memorandum Order. Finally, St. Paul's motion to refer to appraisal the calculation of the duration of the Restoration Period (in terms of number of months and years) is granted.

Counsel are reminded that the bench trial (to which both sides have consented) will begin on September 3, 2003, at which the Court will determine two remaining issues: (1) whether Duane Reade's lease of the WTC store would have been renewed absent the attacks on the World Trade Center; and (2) whether, as alleged in Duane Reade's fourth claim for relief, certain Duane Reade stores outside the World Trade Center were closed by order of civil authority on or about September 11, 2001. *See* Transcript of Hearing, May 9, 2003, at 8.

SO ORDERED.