LAVA TRADING INC., Plaintiff,

v.

**HARTFORD FIRE INSURANCE COMPANY, Defendant.**

No. 03 Civ. 7037(PKC).

United States District Court, S.D. New York.

March 30, 2005.

Finley Harkham, Jeremy J. Flanagan, Anderson, Kill, Olick & Oshinsky, PC, New York City, Jonathan O. Bauer, Anderson, Kill, et ano., Newark, NJ, for Plaintiff.

Elizabeth R. Leong, Melissa Faith Savage, Robinson & Cole, LLP—NYC, New York City, Rebecca Levy–Sachs, Robinson & Cole, LLP, Sarasota, FL, Rhonda J. Tobin, Stephen E. Goldman, Wystan M. Ackerman, Robinson & Cole, LLP, Hartford, CT, for Defendant.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

Plaintiff Lava Trading Inc. ("Lava") has sued defendant Hartford Fire Insurance Company ("Hartford") under a business insurance policy (the "Business Insurance Policy" or "Policy") asserting coverage for certain losses resulting from the terrorist attack of September 11, 2001. Plaintiff's business had been located in One World Trade Center.

In a March 18, 2004 Memorandum and Order, 326 F.Supp.2d 434 (S.D.N.Y.2004), I granted in part and denied in part Hartford's motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., holding that Lava had adequately pled a claim for consequential damages. As I made clear, "it remains to be proven ... whether the parties contemplated that the type of consequential damages alleged to be available here would be the likely result of a breach by Hartford, as well as whether Lava even suffered any losses attributable to Hartford's alleged breach...." 326 F.Supp.2d at 443.

Hartford now moves for partial summary judgment dismissing Lava's claim for consequential damages. It also seeks a ruling, pursuant to Rule 56(d), Fed.R.Civ. P., that the "period of restoration" provided for in the Policy ended on April 30, 2002 and that certain business income losses are not covered because they are excluded as consequential losses or are speculative. For the reasons set forth herein, Hartford's motion for summary judgment dismissing Lava's claim for consequential damages is granted. Hartford's motion also is granted to the extent that it seeks a ruling that the "period of restoration" ended, at the latest, as of April 30, 2002. The Court reserves ruling on the remainder of Hartford's motion.

*Lava's Operations Following the September 11 Attack*

Lava was founded in 1999 and sells computer programs to assist in the electronic trading of equities in various equity markets known as Electronic Communication Networks (ECNs). Allen Cert. ¶¶ 3–4.[1] Lava describes its product as an innovative means for equity traders "to take all the information from all the ECNs and NAS-DAQ and put it into one computer window that would allow for a ready comparison [of the market] for a particular equity." *Id.* ¶ 12. Prior to September 11, 2001, Lava maintained offices, including a functioning data center, on the 83rd floor of One World Trade Center. Those offices were destroyed in the terrorist attack of September 11, 2001. As of September 11, 2001, Lava also maintained a small, "nearly complete[ ]" back up location at 75 Broad Street, which was not destroyed. Allen Cert. ¶ 15; Complaint ¶ 33. As described in Lava's Complaint, the 75 Broad Street location "was not yet fully operational in that it lacked the connectivity necessary for Lava's complete operations." Complaint ¶ 33.

Following the September 11 attack, Lava converted its 75 Broad Street back up facility into a functioning data center. After briefly securing temporary office space at another location, Lava set up temporary offices at 75 Broad Street in October 2001. Complaint ¶ 37. According to Lava, these temporary offices "became operational on October 11, 2001." *Id.*

According to internal Lava e-mails, by October 12, 2001, Lava had resumed operations sufficiently to begin conducting live trades. Ackerman Aff't Exh. 15. In the words of Lava Chief Information Officer Kamran Rafieyan, this was accomplished by, among other things, "getting a new data center built in [Connecticut] as well as building out a totally slick data center at 75 Broad St." *Id.* At that time, Lava executives believed it would be another month (*i.e.*, November 2001) "to get to where we were." *Id.* As of October 22, 2001, Lava CEO Richard Korhammer wrote in an e-mail to Lester Gray of Schroder Investment Management that "[w]e have Merrill, Lehman, and Carlin trading today (We started last Friday). Every week one or two more should be going live." Ackerman Aff't Exh. 20 at LKR 107986. On November 14, 2001, Lava's CEO wrote in an e-mail to a Bruce Rosenthal (whose connection to Lava, if any, is unclear) that "[o]ur volume is about 25% higher than it was before the disaster now. We're back up and running!" *Id.* at LKR 107748.

In December 2001, Lava signed a lease for office space at its present location, 95 Morton Street. Complaint ¶ 38; Pls. 56.1 Response ¶ 14.

On January 8, 2002, Lava, through an independently retained claims adjuster, submitted a preliminary draft Business Interruption and Extra Expense claim for the period September 11, 2001 through November 2001 for $933,658.39. Ackerman Aff't Exh. 12 at LNF 00308, 316. In the preliminary claim submission, Lava's independent adjuster also stated that "the period of interruption has not been determined." *Id.* at LNF 00308. This initial claim appears to assert that Lava's projected revenues would grow from an estimated $600,000 in September 2001 (based on actual revenues for September 1 through 11, 2001 of less than $200,000) to

---

1. Although the parties appear to disagree as to how best to describe the specifics of Lava's business, *see* Defs. 56.1 Statement ¶¶ 3–4 and Pls. 56.1 Response ¶¶ 3–4 & pp. 21–23, any such disagreement, and a detailed description of Lava's business, are not material to the Court's decision on this motion.

almost $350,000,000 in August 2002. *Id.* at LNF 00311. Lava has not provided evidence of any claim made by it with respect to its alleged losses under the Policy other than the preliminary estimate of its adjuster. *See* Pls. 56.1 Response ¶ 21. Although Lava states that it submitted a claim to Hartford for approximately $59 million prior to the commencement of this litigation (*see id.*), it cites only to its Complaint in this action in support of that assertion.

By April 8, 2002, Lava had moved into its new permanent location at 95 Morton Street, while its data center remained at 75 Broad Street. Defs. 56.1 Statement & Pls. 56.1 Response ¶ 16; Complaint ¶ 44. Construction was completed at 95 Morton Street on April 22, 2002. Defs. 56.1 Statement ¶ 17 & Exh. A at HFIC 0017; Pls. 56.1 Response ¶ 17. The parties appear to dispute when a new back up data center in Connecticut was completed. Lava asserts that it was "completed and operational some time after October, 2002" (Complaint ¶ 45; *but see* Ackerman Aff't Exh. 15), while Hartford asserts that the back up center (which it claims was not necessary for Lava to be fully operational) was completed in August 2002 (Defs. 56.1 Statement ¶ 18). As previously noted, prior to the September 11 attack, Lava's then back up facility had not become fully operational.

On December 4, 2002, The Wall Street Journal published an article on Lava's resumption of operations, which Lava posted on its website. Ackerman Aff't Exh. 19. In that article, Korhammer is quoted as stating that "[o]ur customers were out of service [for about a] month and it took about two months before we got everyone back up and running to the levels [they] were prior to 9/11." *Id.* In describing Lava's history on its website, Lava states that "[w]ithin two months of [September 11] the determined and spirited team regrouped and rebuilt their business and data centers ... The company's growth continued and in November 2001, it reached profitability." Ackerman Aff't Exh. 19 at third page.

In June 2003, Hartford determined Lava's operations were suspended for the period September 11, 2001 through October 31, 2001, quantified Lava's business loss during that period and paid Lava over $2 million on its claim under the Business Insurance Policy written by Hartford. Ackerman Aff't Exh. 14.

Lava alleges that by failing to pay its claim for lost business income in December 2001, and by only paying for business income losses through October 31, 2001, Hartford breached the Policy, and as a result, Lava "was forced to obtain funding [in March 2002] to continue its operations, obtain suitable office space, and build a necessary back up location." Complaint ¶ 42. Lava appears to claim that because of Hartford's delay in payment, it was forced to obtain $30 million in financing that it otherwise would have not needed, although it submits no evidence on this point. *See* February 16, 2005 Tr. at 16–18; Pls. 56.1 Response. Lava asserts that its business was not fully restored until a new back up facility was completed in October 2002. Complaint ¶ 45; Allen Cert.

*The Policy*

The Business Insurance Policy held by Lava covers the period January 12, 2001 through January 12, 2002. It provides coverage for physical loss or damage to Lava's property, the loss of business income caused by a suspension of operations in the wake of physical loss or damage to its property, and certain extra expenses incurred as a result of such a suspension. As part of its coverage, the Business Insurance Policy provides that Hartford would pay Lava "for the actual loss of

Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss of or damage to property at the described premises ... caused by or resulting from any Covered Cause of Loss." Policy (Bauer Cert. Exh. C) at LAV 00028. It is coverage under this provision that is at issue on this motion.

Under the Business Insurance Policy, "Operations" is defined as "the type of your business activities occurring at the described premises and tenantability of the described premises." Policy at LAV 00039. The Policy defines "period of restoration" as

" ... the period of time that:

(a) begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises, and

(b) ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality."

Policy at LAV 00039.

"Business Income" is defined as "(1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and (2) Continuing normal operating expenses incurred, including payroll." Policy at LAV 00028.

The Business Insurance Policy also provides coverage for "Extended Business Income" for a limited period. This coverage pays:

"the actual loss of Business Income you incur during the period that:

(1) Begins on the date property is actually repaired, rebuilt or replaced and 'operations' are resumed; and

(2) Ends on the earlier of:

(a) The date you could restore your 'operations' with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or

(b) 30 consecutive days after the date determined in (1) above.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss." Policy at LAV 00029.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation and quotation marks omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, when the moving party has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e).

It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material

element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. *Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, in order to survive summary judgment, plaintiffs must come forth with more than a mere scintilla of evidence in support of their position; they must come forward with evidence "on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505. In the absence of any genuine dispute over a material fact, summary judgment is appropriate.

## II. PERIOD OF RESTORATION

■ As noted above, the Policy defines the "period of restoration" as ending "when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality." Policy at LAV 00039. As a result, there are two issues that arise on this motion relating to the "period of restoration." First, what constitutes the "property at the described premises," the potential replacement of which triggers the end of the "period of restoration" under the Policy? Though offering different interpretations

of the language, neither side claims that the definition of "period of restoration" contains an ambiguity material to this dispute. I agree that the language is unambiguous and thus it raises an issue of contract interpretation, a question of law for the Court. *See U.S. Fire Insurance Co. v. General Reinsurance Corp.,* 949 F.2d 569, 571 (2d Cir.1991) ("[T]he determination of whether a contract is ambiguous ... is a threshold question of law for the court.") (citation omitted). For the reasons discussed below, I conclude that the "period of restoration" ends when the property in Lava's 83rd floor offices (and not the entire World Trade Center complex or the One World Trade Center building) should have been repaired, rebuilt or replaced with reasonable speed and similar quality.

Second, is there any disputed issue of fact as to whether the event triggering the end of the "period of restoration" has come to pass? For reasons also discussed below, I conclude that Hartford has come forward with evidence that the date on which the property at Lava's 83rd floor offices was replaced is, at the latest, April 30, 2002, and that Lava has failed to come forward with any evidence to refute this date.

*What Constitutes "Property at the Described Premises" Under the Policy?*

■ Hartford seeks a ruling that the "period of restoration" ended when Lava should have replaced its business personal property that had been located in its offices on the 83rd floor of 1 World Trade Center at a new location with reasonable speed and similar quality. Hartford urges that I construe the phrase "property at the described premises" to mean the property in Lava's offices on the 83rd floor of the World Trade Center. Lava contends that the phrase "property at the described

premises" refers to the entire One World Trade Center building, and because that building could not be rebuilt within the twelve months following September. 11, 2001, the "period of restoration" should be the maximum twelve months (plus 30 days for certain coverage) permitted under the Policy.

In support of its argument, Lava relies heavily on *Duane Reade, Inc. v. St. Paul Fire & Marine Insurance Co.*, 279 F.Supp.2d 235 (S.D.N.Y.2003), a case brought by the owners of a retail store at the World Trade Center whose business depended on foot traffic by potential customers. On the facts and policy language before it, the Court found that the term "property" in the applicable period of restoration provision unambiguously referred to "the specific premises at which Duane Reade operated its WTC store." *Id.* at 238. The ruling implicitly turned on the contracting parties' understanding of the necessity of a walk-in consumer population to the success of a retail operation. The Court rejected as "untenable" the very argument Lava makes here—that the period of restoration "must be coterminous with the time actually required to rebuild the entire complex that will replace the Word Trade Center." *Id.* at 239.

Here, the "described premises" in the Policy is Lava's suite of offices on the 83rd floor of the World Trade Center.[2] If, as Lava suggests, this Court were to adopt a construction of "property" similar to that in the *Duane Reade* case—that is, that the term "property" itself refers to the specific premises at which Lava operated—the phrase "property at the described premises" would be redundant. I decline to adopt such an interpretation.

Nor do I find the Second Circuit's recent decision in *Zurich American Insurance Co. v. ABM Industries, Inc.*, 397 F.3d 158 (2d Cir.2005) controlling in this case. In *Zurich American,* the Second Circuit held that the insured—which provided janitorial, lighting and engineering services throughout the World Trade Center complex pursuant to a contract with the Port Authority—was entitled to summary judgment on the issue of whether, under the policy at issue, it had an "insurable interest" in the common areas and premises of the other tenants in the World Trade Center. The Second Circuit found that "[t]he existence and configuration of the common areas and tenants' premises were vital to the execution of ABM's business purpose . . . [and] were the means by which ABM derived its income. . . ." 397 F.3d at 165–66. For similar reasons, the Second Circuit found that ABM was entitled to coverage for areas of the World Trade Center that were not part of ABM's own offices, but that ABM "occupied" by its use of the space, even though ABM did not have a legal interest in the space. *Id.* at 166–67. The *Zurich American* decision turned on the policy language and unique facts of a business dependent upon providing services to other tenants.

Lava's Policy specifically provides that there is "no coverage" for the "building." Policy at LAV 002 (Declarations). Here, the "premises" covered by the Policy is specified—suite 8369 of One World Trade Center. *Id.* (In its "location/building rating detail," the Policy even appears to indicate the square footage of the covered space—7500 square feet. *Id.* at LAV 008) In *Streamline Capital, L.L.C. v. Hartford Casualty Insurance Co.*, 2003 WL

---

**2.** Although the 22nd floor of 75 Broad Street appears to have been added to the Policy as a covered location for certain purposes, *see* Policy at LAV 0014, Lava is not arguing that 75 Broad Street should be considered part of the "described premises" for purposes of the issues before the Court on this motion.

22004888, at *9 (S.D.N.Y. Aug.25, 2003), the Court held, under identical policy language, that the phrase "property at the described premises" referred to the insured's business personal property located in its rented office suite. The Court found that the "described premises" under the policy was the insured's office suite on the specified floor of One World Trade Center, and not the entire building. The Court concluded that the "period of restoration" therefore should end when the insured's business personal property in its World Trade Center offices should have been repaired, rebuilt or replaced with reasonable speed and similar quality.

I find the reasoning of the *Streamline* decision persuasive in this case. As the Court concluded, "[i]t is wholly unreasonable to think that the period of restoration should be tied to the rebuilding of real property over which neither the insured nor the insurer had any control, instead of tying it to a process that the plaintiff controlled: the acquisition of replacement office space and the installation of the plaintiff's personal property in that space." 2003 WL 22004888, at *8. Nothing in the Hartford training materials relied upon by Lava supports a different conclusion. *See, e.g.,* Bauer Cert. Exh. E at HCAS 2560 (noting that "the direct physical damage must be at the 'described premises'" and providing an example of damage elsewhere in a building that would not give rise to coverage for a premises that was described as "10 State Street—Unit 801" as opposed to simply "10 State Street").

Two points of clarification are in order. First, although I agree that the Policy does not tie the "period of restoration" to the rebuilding of One World Trade Center, and that the phrase "property at the described premises" refers to property located in Lava's rented office suite, I refrain from ruling whether the coverage for such

property could ever include property other than the insured's business personal property at the "described premises." There does not appear to be any claim that any property other than Lava's business personal property is at issue. It suffices to rule that the "period of restoration" ends when the property at Lava's 83rd floor offices should have been repaired, rebuilt or replaced with reasonable speed and similar quality.

Second, I do not read the *Streamline* decision to have ruled, as defendants suggest, that "the period of restoration concludes by the time plaintiff should have been able to reestablish its operations, either at the World Trade Center site or in some other location." Defs. Br. at 12 (quoting *Streamline,* 2003 WL 22004888, at *7). The Court's holding was decidedly narrower: the "period of restoration" ends when the property *necessary to resume operations* should have been repaired, rebuilt or replaced with reasonable speed and similar quality, and not when operations have been actually resumed, whether to their pre-loss levels or otherwise. The unambiguous definition of "period of restoration" does not look to the resumption of a policyholder's "operations" as a measuring stick. It looks to "when the property at the described premises· should be repaired, rebuilt or replaced." The purpose of providing coverage only during the "period of restoration" is to provide a limit, where necessary, to the amount of business income recoverable in those situations where a policyholder's ability to restore its business income to previous levels may extend beyond any period during which the policyholder reasonably "should" repair, rebuild or replace its damaged property. *See, e.g., Business Interruption Insurance Current Issues,* 702 Practicing Law Institute/Litigation 233, at 253–54 (2004) ("The theoretical period [of restoration] is the length of time needed to replace or repair the damaged property in

the exercise of due diligence and dispatch ... Thus, the insured will not recover for any additional contingent business interruption loss beyond the theoretical period in the absence of expanded ... coverage. The theoretical period can terminate while the insured is still losing sales."); *see also Duane Reade,* 279 F.Supp.2d at 239.[3]

■ Thus, I disagree with Lava's assertion that the "period of restoration" should be measured by "the time needed for the policyholder to resume functionally equivalent operations"—whether at its former location or elsewhere (Lava Br. at 5). Such a result would be contrary to the unambiguous definition of "period of restoration," and would render superfluous the provision for Extended Business Income Coverage, which explicitly provides coverage for the potentially longer—*i.e.,* "extended"—period, up to 30 days, that it may take to "restore [the insured's] Operations ... to the condition that would have existed if no direct physical loss or damage occurred." *See also* Pls. 56.1 Counterstatement p. 30 (quoting Hartford training materials that note that "the Extended [Business Interruption] Period often begins immediately after the Period of Restoration ends. The two periods do not overlap."); *Duane Reade,* 279 F.Supp.2d at 239 (any losses continuing beyond the "hypothetical ... (as opposed to actual) time for rebuilding ... would be addressed by the 'Extended Recovery Period' provision in the Policy.").

*Is There a Triable Factual Dispute as to Whether the "Period of Restoration" Extended Beyond April 30, 2002?*

■ Having construed the Policy language "property at the described premis-

es" to mean the property in Lava's 83[rd] floor offices, the question remains whether Lava has succeeded in raising any genuine issue of material fact as to when that property should have been repaired, rebuilt or replaced, thereby ending the "period of restoration." Hartford has come forward with evidence that Lava had replaced the property at in its 83[rd] Floor offices when construction was completed and Lava occupied its new location, 95 Morton Street, which was, at the latest, by April 30, 2002. *See* Defs. 56.1 Statement ¶¶ 16–18. Plaintiff does not dispute these facts. *See* Pls. 56.1 Response ¶¶ 16–18 and Counterstatement p. 28 (stating that Lava moved into 95 Morton Street on April 5, 2002 and that construction was completed on April 22).

As I read Lava's opposition papers, the only factual issue it seeks to raise is whether Lava had fully restored its operations as of April 30, 2002. And the only fact Lava points to in this regard is that its Connecticut back up data center was not fully operational by this date. *See* Allen Cert. ¶¶ 20–30; Pls. 56.1 Response ¶ 18; Pls. 56.1 Counterstatement pp. 25–29. Assuming (as I do) that Lava has raised a genuine dispute over this fact, I conclude it is not material to a determination of when the "period of restoration" ended. Any shortcoming of Lava's new back up data center cannot serve to extend the "period of restoration." As I have ruled, the "period of restoration" is measured by when the property that was in the "described premises"—Lava's 83rd Floor offices—should have been repaired, replaced or rebuilt, and not by the resumption of operations.

---

3. Of course, the reverse is also true: a policyholder's business income claim could end on the date that it actually resumes "operations," even if that event happens prior to the end of the theoretical period of restoration. Al-

though the evidence on this motion suggests that Lava may well have resumed its operations prior to April 30, 2002, Hartford has not sought summary judgment on this basis.

Rather than disputing that this was accomplished by April 30, 2002, Lava argues only that it needed a fully functional back up data center to be fully operational, and that its Connecticut back up center was not fully functional until the fall or winter of 2002. But before September 11, 2001, Lava's back up data center was not part of the "described premises"—it was several blocks away. Therefore, the time it took to rebuild the off-site back up center is not included within the "period of restoration." For the reasons I have fully discussed, the point in time when Lava fully resumed all operations, including those not originally within the "described premises," is immaterial to the issue of when the "period of restoration" ended. Because Lava offers no evidence to contradict Hartford's showing that the "period of restoration" should end, at the latest, on April 30, 2002, Hartford is entitled to a ruling in its favor on this issue. *See Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505 ("Factual disputes that are irrelevant or unnecessary will not be counted."); *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11–12 (2d Cir.1986) ("[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment.") (citation omitted; alteration in original).

■■ Although not material, Lava has failed in any event to create any factual dispute as to whether a fully functioning back up center was necessary for Lava's operations. Lava sets forth no evidence in opposition to that portion of Hartford's 56.1 Statement addressing the back up data center and its date of completion.

Instead, Lava states simply that "Hartford's entire statement is argument" and that "Lava did indeed have a back up center prior to the loss as required by several of its clients." Pls. 56.1 Response ¶ 18. But characterization and conclusory description do not create a triable issue of fact. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (opposing party may not create a genuine issue of fact "merely by the presentation of assertions that are conclusory"). Nor is "a Local Rule 56.1 statement ... itself a [proper] vehicle for making factual assertions that are otherwise unsupported by the record. Where ... the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir.2001).[4]

Indeed, Lava's Chief Operating Officer acknowledges that as of September 11, 2001, the 75 Broad Street back up center was only "nearing completion" (Allen Cert. ¶ 27) and the facility's servers were not installed. *Id.* ¶ 24 (noting that "the completion of the [75 Broad Street] data center was ... 90 days away"). *See also* Pls. 56.1 Response ¶ 2 (admitting that as of September 11, 2001, construction at 75 Broad Street was not complete). The Allen Certification also acknowledges that Lava's customers do not require a completed data center in order to do business with Lava. Allen Cert. ¶ 25 (attesting that customers "insisted that Lava have a back-up data center that was near completion before doing business with Lava"). In short, nothing in Lava's response to Hartford's 56.1 statement with respect to the role and functioning of Lava's off-site back

4. The Certification of Lava's Chief Operating Officer, Charles .C. Allen, cited in support of Lava's response to paragraph 18 of Hartford's 56.1 statement—which appears to address technical difficulties at 75 Broad Street after September 11 unconnected to the damage to Lava's property at the premises covered in the Policy—does not in fact address the facts in the cited paragraph: *See* Allen Cert. ¶ 28.

up data center creates any genuine issue of material fact as to the appropriate end date of the "period of restoration."

## III. CONSEQUENTIAL DAMAGES

In addition to all sums that it alleges are due and owing under the Policy, Lava seeks as "consequential damages," *inter alia*, the following: (1) costs to secure funding which should have been provided by Hartford; (2) damages resulting from the alleged loss of clients; and (3) damages resulting from the alleged loss of future business growth. At the pleading stage, I denied Hartford's motion to dismiss. The parties have now had a full opportunity to conduct discovery and Hartford moves for summary judgment.

In *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) ("*Kenford II*"), the New York Court of Appeals held that "[i]t is well established that in actions for breach of contract, the nonbreaching party may recover . . . such unusual or extraordinary damages [as] have been brought within the contemplation of the parties as the probable result of a breach at the time or prior to contracting." *Id.* at 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (citations omitted). In order to determine what damages are reasonably contemplated by the parties, "the nature, purpose and particular circumstances of the contract known by the parties should be considered . . . as well as 'what *liability* the defendant fairly may be supposed to have assumed consciously, *or to have warranted the plaintiff reasonably to suppose that it assumed,* when the contract was made.'" *Id.* (citations omitted; emphasis added); *see also Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332–33 (2d Cir.1993) (finding that plaintiff had "failed to establish its lost future profits with the degree of certainty required by *Kenford* [] . . . and has

failed to establish that *liability* for such damages were contemplated by the parties at the time of contracting."). As the quoted language makes clear, the availability of consequential damages in a given case requires an examination of: (1) the particular contract at issue; (2) whether there has been any conscious assumption of liability by a contracting party; and (3) whether, by words or deeds, one party was reasonably led to believe that the other had assumed such liability. Thus, as indicated in my prior rulings on the subject, the Court in *Kenford II* looked to whether there was a "provision in the contract" *or* "any evidence in the record to demonstrate that the parties, at any relevant time, reasonably contemplated *or would have contemplated* that the [defendant] was undertaking a contractual responsibility" for the consequential damages sought by the plaintiff. *Kenford II*, 73 N.Y.2d at 320, 540 N.Y.S.2d 1, 537 N.E.2d 176 (emphasis added); *see also Trademark Research Corp.*, 995 F.2d at 334 (finding that "[t]he record contains no specific evidence that, at the time of contracting, [defendant] accepted liability for nine years of lost profits. No evidence was offered that the parties ever discussed lost profits liability.").

In order to prevail, Lava is required to "'establish that liability for [the consequential damages sought] were contemplated by the parties at the time of contracting.'" *Lava Trading Inc. v. Hartford Fire Insurance Co.*, 2004 WL 943565, at *2 (S.D.N.Y. May 3, 2004) (quoting *Trademark Research Corp.*, 995 F.2d at 332–33). Plaintiff must present evidence "of 'what the parties would have concluded had they considered the subject,' or that, in light of the parties' discussions on the subject, one party would have been led to believe that the other was assuming liability for such damages." *Id.*

On its motion for summary judgment, Hartford has pointed to a lack of any such evidence, and has presented evidence that neither it nor plaintiff contemplated that Hartford would be liable for consequential damages in the event of a breach. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Fdn.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). "In other words, the moving party does not bear the burden of disproving an essential element of the nonmoving party's claim." *Bussa v. Alitalia Linee Aeree Italiane, S.p.A.*, 2004 WL 1637014, at *3 (S.D.N.Y. Jul.21, 2004). In light of Hartford's initial showing that there is no evidence that the parties contemplated, or that Hartford reasonably warranted, that Hartford would be liable for the consequential damages sought here in the event of a breach of the Policy, the burden shifts to Lava to "set forth specific facts showing that there is a genuine issue for trial," and it cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P.

In opposition to Hartford's motion, Lava points only to internal Hartford documents demonstrating that Hartford was aware of the reasons why people buy business interruption coverage, and the importance of resolving such claims promptly to minimize actual lost income. Thus, Lava quotes from certain training materials that acknowledge that when a business is experiencing downtime, its net earnings may be affected, and that swift action on the part of the insurer may be beneficial to the policy holder. Lava also relies on certain advertising materials in which, it asserts, Hartford touts the type of policy at issue as security against "unexpected loss [ ] wip[ing] out your bottom line" (Bauer Exh. I at HCAS 02545) and claims that "you simply can't afford to be caught short on insurance protection" (Bauer Exh. K at HCAS 02539). Lava also relies on certain statements from Hartford claim adjuster Peter Pollicino, who acknowledged, not surprisingly, that a lack of insurance coverage could "be deadly to a business" and/or "wipe out" a business financially. Bauer Cert. Exh. L at 471.

None of this "evidence," however, creates a genuine issue of material fact as to whether Hartford was assuming liability for consequential damages in the event of a breach. The evidence adduced by Lava simply illustrates the rather unremarkable proposition that business interruption insurance is meant to insure against loss of business income and other expenses, and that if a company does not have such insurance, they stand the risk of financial consequences if they are not otherwise prepared. It is a significant leap of reasoning to conclude from this that Hartford understood that it would be liable for the consequential damages sought here, or was warranting to Lava that it would be so liable. No reasonable jury could conclude otherwise.

Of course, New York law also requires that the Court consider "the nature, purpose and particular circumstances of the contract known by the parties" in determining whether consequential damages are available. *Kenford II*, 73 N.Y.2d at 319, 540 N.Y.S.2d 1, 537 N.E.2d 176. The Appellate Division, Third Department, has held that "[t]he very purpose of business interruption coverage would make defen-

dant aware that if it breached the policy it would be liable to plaintiffs for damages for the loss of their business as a consequence of its breach or made it possible for plaintiffs reasonably to suppose that defendant assume such damages when the contract was made." *Sabbeth Industries Ltd. v. Pennsylvania Lumbermens Mutual Insurance Co.*, 238 A.D.2d 767, 769, 656 N.Y.S.2d 475 (3d Dep't 1997). But in *Sabbeth*, the insurer disclaimed *any* coverage under the policy, and plaintiff sought the "lost value of its business" and other damages. It is not clear from the Court's opinion which of these losses would have been due under the policy had the insurer met its obligations. Certainly, if an insurer breaches its policy, it should expect to be liable for covered losses under the policy. But most importantly, *Sabbeth* was decided in the context of a motion to dismiss. As in *Sabbeth*, I denied Hartford's motion to dismiss and have given Lava the opportunity to prove its allegations. This plaintiff's "consequential damage" claim fails because there is no evidence to support it.

Nothing in the Policy before me would lead either the insured or the insurer to understand that the insurer, in the event of breach, would be liable for costs to secure funding that should have been provided by Hartford, the loss of clients or the loss of future business growth. Lava relies on language in the Policy itself that provides, for example, that there is no dollar limit for business interruption coverage, which is limited only by a maximum of twelve months plus thirty days. Policy at LAV 0028 & 0029. From this provision, and the fact that the Policy was designed to pay Lava for certain expenses and lost income during the period it could not operate (up to a maximum of 13 months), Lava extrapolates that "[b]oth parties understood ... that Lava's lost income would be greater if (1) business interruption cover-

age were denied or delayed; or (2) of the Period of Restoration were miscalculated or abbreviated by Hartford's own wrongdoing; and (3) that Hartford would be responsible for paying the costs of its delay or wrongdoing." Lava Br. at 18. Lava's conclusion, however, does not follow from the cited Policy provisions. Indeed, it is undermined by the fact that the Policy contemplates substantial delay in payment, during which time both the insured and the insurer presumably are assessing the losses, the insured is submitting its claim, and any differences between the insured and insurer are resolved. *See* Policy at LAV 0035–0038 (providing, *inter alia*, that the insurer will pay for a covered loss within 30 days of receiving the signed statement of loss only if (1) the insured has complied with all of the terms of the Policy and (2) the insured and the insurer have agreed upon the amount of the loss or an appraisal award has been made). Thus, the Policy contemplates that a period of at least 90 days may pass before Hartford indicates its intentions with respect to a claim, and contemplates payment within 90 days (or less) of a covered loss only if the insured has complied with all the terms of the Policy and the insured and insurer have reached an agreement as to the amount of the loss or "an appraisal award has been made." *Id.* The Policy sets forth an explicit dispute resolution mechanism, to be conducted by an appraiser, that either party may invoke in the event of any disagreement as to the amount of loss. *Id.* at LAV 0036. (There is no evidence in the record before me on this motion that Lava ever sought, or obtained, an appraisal award, or indeed made any claim other than that made in January 2002. *See* Pls. 56.1 Response ¶ 21.) In short, contrary to Lava's position that the Policy language would lead Hartford to understand that any delay in payment or disagreement

with respect to the claim would render it liable for the consequential damages sought, the Policy explicitly recognizes that delay (including potential delay of more than three months) is foreseeable.

Although the Policy language may have a direct bearing on whether damages sought were within the contemplation of the parties, it is not necessarily controlling on the issue. *Lava Trading Inc. v. Hartford Fire Insurance Co.*, 326 F.Supp.2d 434, 442 (S.D.N.Y.2004). I have considered the Policy exclusions and payment provisions cited by Lava in support of its contention that liability for consequential damages are contemplated by the Policy, as well as the entirety of the Policy, and conclude they, either alone or in conjunction with other evidence, do not raise a genuine issue of material fact as to whether the parties contemplated consequential damages of the kind and character sought.

The loss of business income that arises from a covered loss such as the destruction of the World Trade Center was, indeed, contemplated by the parties. That was the purpose of the contract of insurance. But, with the benefit of the full summary judgment record before me, I conclude that the consequential damages that this plaintiff seeks were not contemplated as a foreseeable consequence of a breach of Hartford's duty to pay under the Policy. The parties knew that Hartford would be liable for the sums paid and they knew that if those sums were not paid, Hartford would be liable for simple interest at 9% per annum from the date of the breach. *See* N.Y. C.P.L.R. §§ 5001 & 5004 (McKinney's 1992 & 2005 Supp.); Feb. 16, 2005 Tr. at 18. In response to Hartford's motion, Lava has failed to raise a triable issue of fact as to whether anything further was contemplated.

*CONCLUSION*

Hartford's motion for summary judgment dismissing Lava's claim for consequential damages is GRANTED. On Hartford's motion, I conclude under Rule 56(d), Fed.R.Civ.P., that the following fact "appear[s] without substantial controversy": the "period of restoration" ended no later than April 30, 2002.

Hartford has also moved for summary judgment on the grounds that the damages sought by Lava are excluded under the Policy or are too speculative to be recovered. I reserve ruling on this part of Hartford's motion.

SO ORDERED.